# Wytheville.

## SMOKELESS FUEL COMPANY v. THE CHESAPEAKE AND OHIO RAILWAY COMPANY.

### June 11, 1925.

Argued before Judge Chichester took his seat.

1. CARRIERS—*Demurrage—Action Against Member of Coal Exchange—Privity of Contract.*—In an action by a carrier against a member of a coal exchange for demurrage, defendant insisted that the action was based on a form of the exchange which was not signed by it until after the demurrage charge in question had been incurred. But the action was not on the form alone, but on that form and stipulations and agreements contained in the rules and regulations in the coal exchange of which defendant was a member and by which it was bound. And the lack of privity between the carrier and defendant was supplied by section 5143 of the Code of 1919, as to when a person not named a party, or named jointly with others, may take or sue under an instrument.

2. CARRIERS—*Action for Demurrage against Member of Coal Exchange—Condition Precedent—Case at Bar.*—In the instant case, an action by a railroad company against a member of a coal exchange for demurrage charges, defendant insisted that the railroad company had no right of action against it until the apportionment of demurrage charges has been made by the exchange to each member, and the railway company has rendered to such member a bill in accordance therewith; that this is a condition precedent to the right to sue; and that the railway company must show compliance therewith before it can recover. While this is true, yet, where the exchange made the apportionment and rescinded it while the present action was pending, this subsequent action of the exchange could not take away plaintiff's right of action

3. CARRIERS—*Demurrage Rates—Rules of a Coal Exchange—Publication in Tariff.*—Demurrage charges by a carrier to members of a coal exchange were those fixed in the published tariffs of the Interstate Commerce Commission. The rates charged were based solely on the tariffs, and no recourse to the rules and regulations of the exchange was necessary to ascertain the amount of the demurrage. The rules and regulations of the exchange did not "change, affect,

or determine" the tariff charges made against the exchange; but after the tariff charges had been determined and fixed, they only affected the apportionment between, and the collection of, these charges from members of the exchange.

*Held:* That it was not necessary for the rules and regulations of the exchange relating to demurrage charges to be filed with the Interstate Commerce Commission.

4. CARRIERS—*Tariffs—Construction—Intention of Framer—Construction against Maker.*—Tariffs are to be construed according to their language, and the intention of the framers is entitled to little, if any, consideration in cases of doubt, the language of a tariff is to be construed most strongly against those who frame it. Subject to these qualifications, the interpretation of a written tariff stands upon no different footing from that of other written instruments.

5. CARRIERS—*Tariffs—Construction—Nontechnical Words—End in View.*— Nontechnical words are to be given their usual and ordinary significIation, and the instrument is to be read as a whole, and if apparent inconsistencies can be reconciled they should be, in order to give full effect to the language used. It is also entirely legitimate, in seeking to ascertain the meaning of the language used, to consider the end in view, the object sought to be accomplished by the making of the instrument. If in these circumstances, the language of a tariff is fairly susceptible of a reasonably plain meaning, that construction should be put upon it. It is not the part of the judicial expositor to inquire whether or not, by strained or forced interpretation of separate words or paragraphs, considered disconnectedly, some other construction might not be possible.

6. CARRIERS—*Demurrage—Pools.*—The chief object of demurrage charges is to expedite the transportation of personal property, to keep the means of that transportation actively moving as much of the time as possible. To this end pools have been formed and tariffs published, permitting substitution of detention and the allowance of demurrage credits and debits, and they have proved so efficient and valuable that it would greatly cripple coastwise and international commerce to seriously interfere with them. Pooling would seem to be a practical necessity, and it has been repeatedly sustained by the Interstate Commerce Commission.

7. CARRIERS—*Demurrage—Substitution of Cars—Release of Both Cars.*— I. C. C. tariff 8645, rule 3 (b) (clause 4), provides that cars may be delivered otherwise than in the order of their arrival, and that the dates on which the substituted cars are delivered shall be used in computing the detention of cars for which they are substituted. Clause 1 provides that a car shall be released when coal or coke is dumpted into the vessel. In the instant case, it was the contention of the defendant that when a substituted car (one of later arrival) is

actually dumpted into a ship, it is released under clause 1, and that the car for which it is substituted is also released by virtue of clause 4.

*Held:* That reading rule 3 as a whole, there is no authority for the contention that the dumping of the substituted car operates to release not only that car, but also the one for which it is substituted.

8. CARRIERS—*Action for Demurrage Charges—Limited Services.*—In the instant case, an action by a carrier against a shipper for demurrage charges, the service contracted for and performed was the transportation of coal and its delivery into a vessel. The value of the service to the shipper was not lessened or impaired, nor the liability of the carrier in any way diminished by a tariff rule permitting the dumping of cars out of order. No limited service therefore was contracted for, and the shipper was not entitled to the option of a lower rate, by analogy to contracts limiting common law liability.

9. CARRIERS—*Demurrage—Pooling—Rates of Demurrage for Members and Nonmembers of the Pool—Case at Bar.*—A coal exchange was the common consignee of all coal shipped by its members, and the demurrage bills were compiled under the I. C. C. tariff in the same manner as demurrage was compiled and assessed against other shippers outside of the exchange. There was no departure from the rates, fares, and charges which were specified in the tariff filed and in effect. After the bill for demurrage was rendered to the exchange it was to be apportioned among, and to be paid by, the members as provided in the pool agreement; but this did not affect the validity or correctness of the charges. The distribution of the amount was simply the result of a valid pool arrangement.

10. CARRIERS—*Demurrage—Pooling—Rates of Demurrage for Members and Nonmembers of the Pool—Case at Bar.*—Pooling is open to all shippers, and a shipper may enter a pool or not as he chooses. If the *rate* is the same to a shipper out of a pool as to one in a pool, it cannot be a valid objection that, in consequence of the pool arrangement, the *amount* paid by one in the pool is less than that paid by one not in the pool. Otherwise, there could be no valid pools.

11. CARRIERS—*Demurrage—Pooling—Rates of Demurrage for Members and Nonmembers of the Pool.*—The interstate commerce act was enacted to secure equality of rates, and so long as the carrier collects its full *tariff rate*, there is nothing in section 6 of the interstate commerce act, U. S. Comp. St. 8569, to prohibit several shippers from entering into an average demurrage agreement whereby the *amount* paid by the several members of the pool is *different* from what they would have had to pay if operating out of the pool.

12. CARRIERS—*Demurrage Charges—Demurrage Determined by Published Tariff—Case at Bar.*—In the instant case, an action by a carrier for demurrage charges, the charges were for the months of January, February, and September for 1921. The demurrage was computed

under I. C. C. 8645, rule 3 (b) (clause 4). This clause 4 of rule 3 (b) never appeared in the demurrage tariffs of the railway company filed with the Interstate Commerce Commission until March 29, 1921, and hence the substituted service therein provided for cannot form the basis of demurrage charges for the months of January and February, 1921. In the preceding tariff, I. C. C 7777, clause 4 of rule 3 (b) did not appear. If the right to make the demurrage charges was a matter of contract, authority would have been found in the contract between defendant and the coal exchange, of which defendant was member. But the right to make the charges was not a mere matter of contract but was to be determined by the published tariff.

13. CARRIERS—*Demurrage—Demurrage Charges Fixed by Tariff.*—A railroad company has no choice in the matter of making a demurrage charge fixed by the tariff against every shipper of its road    The railroad company could not waive the right to make the charge, without creating a preference forbidden by law, and it is not to be presumed that such waiver was made

14. CARRIERS—*Demurrage—Judgment by Appellate Court—Case at Bar.*—In the instant case, an action for demurrage charges where the Supreme Court of Appeals did not find that the trial court considered and determined whether or not any of the demurrage accrued under I. C. C. tariff 7777, or that the case was so developed that the trial court could have determined that question, the matter being one that affected the public interest, and of much importance to the parties, the court remanded the case to the trial court for a new trial on so much of the account sued on as embraced the right to recover demurrage charges for the months of January and February, 1921, for which months tariff 7777 had not been superseded by tariff 8645.

Error to a judgment of the Circuit Court of the city of Newport News in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed and remanded.*

The opinion states the case.

*Gibbs L. Baker* and *J. Winston Read*, for the plaintiff in error.

*Henry Taylor, Jr., Sherlock Bronson, Chas. E. Ford* and *R. M. Lett,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This is a proceeding by notice of a motion for a judgment brought by The Chesapeake and Ohio Railway Company against the Smokeless Fuel Company to recover for car demurrage. The notice was as follows:

"To Smokeless Fuel Company, a corporation:

"Take notice: That the Chesapeake and Ohio Railway Company, a corporation, will move the Circuit Court of the city of Newport News, on the first day of May, 1922, for a judgment against you in the sum of ten thousand six hundred and sixty-eight dollars and forty-three cents ($10,668.43), with interest on ten thousand three hundred and fifty-seven dollars and seventy cents ($10,357.70) from March 1, 1922, which is for demurrage, and three hundred and ten dollars and seventy-three cents ($310.73) is war tax thereon, all of which is on account of coal shipped by you over said railroad, consigned to the Newport News Coal Exchange, at Newport News, Virginia, of which you were a member and subscribed to and are bound by the rules and regulations of said coal exchange. Rule seventeen being:

"*Demurrage Bills.*—17. The Chesapeake and Ohio Railway Company will submit a statement to the exchange at the close of each calendar month, as required by its tariffs, itemized to show dates of arrival and release of cars, covering total demurrage accruing against the exchange during the month. The exchange will compile car or tonnage days detention accounts against each member and apportion to each member having car or tonnage days detention during the cal-

endar month during which the demurrage accrued, his proportion on the basis of his car or tonnage days detention, as compared to the total car or tonnage days detention. Bills to individual members will then be rendered by the Chesapeake and Ohio Railway Company, in accordance therewith, and payment must be made by members immediately on receipt of bill.

"That the said railway company submitted said statement to the exchange as above provided and the monthly amount of demurrage due by you, as compiled, apportioned and ascertained by the said coal exchange, and for which bills have been rendered you, pursuant to said agreement, were as follows:

| "1921 | Demurrage | War Tax | Total. |
|---|---|---|---|
| "Jan. | $ 4,667.87 | $140.04 | |
| "Feb. | 5,464.83 | 163.94 | |
| "Sept. | 225.00 | 6.75 | |
| | "$10,357.70 | $310.73 | $10,668.43 |

"All of which you agreed in writing on the 20th day of January, 1921, that you would pay to the said railway company, as follows, to-wit:

"Newport News Coal Exchange, Inc.
"Agreement—Form 'C'
"Dated at Charleston, W. Va. 1–20–1921.
"To Mr. L. C. Spengler, General Agent,
"The Chesapeake and Ohio Railway Company,
"Newport News, Virginia.
"Dear Sir:
"I (or we) hereby agree to pay all freight charges, when waybilled collect; loading barges; and car demurrage charges assigned to me (or us) by authority of

the commissioner or deputy commissioner of the Newport News Coal Exchange, Inc., on coal shipments going into vessels for my (or our) account at Newport News, Virginia, under the Newport News Coal Exchange, Inc., agreement, whether shipped from mines, or obtained elsewhere, for my (or our) account, or for the account of any other member of the Exchange.

"SMOKELESS FUEL COMPANY,
"(Name of Exchange Members)
"Per GEO. P. DANIELS.

"Which amount, or any part thereof, you have omitted, refused and failed to pay, so that the same is now due and owing to said railway company, for which it will ask judgment with interest thereon as aforesaid.

"THE CHESAPEAKE AND OHIO
RAILWAY COMPANY,
"By Counse l."

Both the plaintiff and the defendant were members of the Newport News Coal Exchange, Inc., a corporation formed for the purpose of facilitating the transshipment of tidewater coal from car to vessel. This was accomplished by pooling the coal of all its members. All of the coal was consigned to the exchange, with proper designation of the shipper. The coal was never dumped into a common heap, but was held in the cars of the railway company until dumped into vessels. The coal was divided into pools according to the quality, size, etc., of the coal, and the shipper designated the pool into which he thought it should be put, and upon arrival the coal was inspected and placed in its proper pool. In order to ship through the exchange it was necessary to become a member by the purchase of one share of its stock of the value of $50.00, and signing an agreement to abide by the rules and regulations of the exchange and to carry out the terms and conditions of

membership. Under the rules and regulations the shipper got credit in the pool for his coal as soon as the exchange was notified of its shipment from the mines, and might dump it immediately. Coal in the pool to which the shipper's belonged could be ordered dumped by him although his coal was still rolling. Elaborate and detailed arrangements were provided for demurrage debits and credits, and the apportionment thereof among the members, and the methods of settlement and payment thereof. These will more fully appear in the discussion following. The rules provided for an average demurrage agreement. While all of the coal was shipped to the exchange as the consignee, and the monthly statements of the demurrage were rendered to the exchange, the apportionment of the demurrage charges among the members had to be made by the commissioner of the exchange, and, when approved by the members, payment had to be made by the members to whom it was so apportioned, and not by the exchange. The exchange was not liable for the demurrage. When a member approved the apportionment made to him by the commissioner of the exchange, the apportionment became the bill of the railway company against the member for his share of the demurrage.

In 1921 the railway company rendered to the exchange statements of demurrage charges for the months of January, February and September, 1921, and they were apportioned by the commissioner of the exchange among its members, and the amount found due by the fuel company was $10,668.43. This amount was not approved by the fuel company, but demand was made on it for payment by the railway company and refused. Thereupon this action was brought on May 1, 1922. After the action was brought, to-wit: On June 6, 1922, the board of directors of the exchange appointed an

audit committee and directed it to employ an auditor to make the necessary checks of the accounts, and undertook to suspend the apportionment that had theretofore been made by the commissioner of the exchange. An auditor was appointed by the committee and made two audits of the account. One of these was made in accordance with the view of the railway company of its demurrage tariff, and the other in accordance with the views of the exchange. There was a wide difference between the two as to the proper interpretation of the demurrage tariff. The auditor found upwards of five thousand errors of one kind or another in the statement theretofore made by the railway company. But after correcting these errors and apportioning the amount found due for demurrage according to the rules of the exchange, he ascertained that the fuel company owed the railway company, according to its interpretation of the tariff, $8,628.48 (which is the amount recovered in the present action), and according to the exchange's interpretation $915.39. On March 8, 1923, on the coming in of these audits, the board of directors of the exchange approved the audit made in accordance with its views, and disapproved that made in accordance with the railroad company's views, and directed that no apportionment should be made of the amount found according to the views of the railroad company. On May 17, 1923, this resolution of the board of directors was ratified by the stockholders, and it was further ordered "that no apportionment of said incorrect bills shall be made to members of the exchange, and in case any such apportionments have heretofore been made that the same be and are hereby withdrawn."

The main feature of difference between the parties as to the interpretation of the demurrage tariff was that

the fuel company insisted that when a car was dumped otherwise than in the order of arrival, not only did that release the car that was actually dumped into the ship, but also released the car for which it was substituted. In other words, that for each car dumped out of order two cars were released, although only one was emptied and made available for use by the railway company. This contention the railway company denied.

The fuel company also contended that the rules and regulations of the exchange relating to demurrage charges should also have been published as a part of the tariff of the railroad company, as well as the tariff itself, and that as these rules and regulations had not been so published the railway company had no tariff under which it could assess the demurrage sued for and recovered in this action.

There was a demurrer to the notice, which was overruled. Thereupon the parties submitted all questions of law and fact to the judge of the trial court, who rendered the judgment herein complained of. There are eleven assignments of error, but the first ten relate almost exclusively to the admission of certain evidence which is involved in the eleventh assignment of error, and the whole controversy is discussed under the eleventh assignment of error, which relates chiefly to the interpretation of the tariffs of the railway company.

A number of questions are discussed in the briefs, and, while we have not discussed each one in detail, we have covered them so far as we deem necessary to a proper conclusion. Some of those discussed are of minor importance, but it was deemed necessary to dispose of them.

It was argued for the fuel company that this action is on Form "C" alone, that it was not signed by the fuel company till March 20, 1921, and that there is no evi-

dence to support a recovery under Form "C." Much stress is laid on the words "coal shipments going into vessels." They are simply descriptive of the coal to be taken into account in the application of rule 17 of the exchange, and refer to coal shipped for the purpose of "going into vessels," and were so construed by the exchange, and apportionments were made upon that basis.

[1] The proceeding is not on Form "C" alone, but on Form "C" and on the stipulations and agreements contained in the rules and regulations of the coal exchange of which defendant was a member and by which it was bound. The form of the notice shows this, and especially refers to and copies rule 17, which was essential to the operation and enforcement of the contract set out in Form "C." On joining the exchange, members had to assent to its rules and regulations, and rule 14 expressly provides that "members shall sign an agreement on Exchange Form C," and copies Form "C" in the rule. This Form "C" was signed by the fuel company before it shipped any coal through the exchange, and bound it to the observance of rule 17 and all other rules and regulations of the exchange. The prime object of the formation of the exchange would have been frustrated if some such agreement had not been made. The lack of privity so often referred to and relied on by counsel for the fuel company is fully supplied by section 5143 of the Code, copied in the margin.* The contract between the exchange and the

* "*Section 5143. When person not named a party, or named jointly with others, may take or sue under instrument.*—An immediate estate or interest in or the benefit of a condition respecting any estate may be taken by a person under an instrument, although he be not a party thereto; and if a covenant or promise be made for the benefit, in whole or in part, of the person with whom it is made jointly with others, such person, whether named in the instrument or not, may maintain in his own name any action thereon which he might maintain in case it had been made with him only,

fuel company was certainly, in part at least, for the benefit of the Chesapeake and Ohio Railway Company.

[2] The fuel company insists that the railway company has no right of action against it until the apportionment of demurrage charges has been made by the exchange to each member, and the railway company has rendered to such member a bill in accordance therewith; that this is a condition precedent to the right to sue; and that the railway company must show compliance therewith before it can recover.

The railway company did render to the exchange an account of demurrage charges against it. The exchange made the apportionment, and the railway company rendered bills in accordance therewith. The bill against the fuel company was not paid, and this action was brought thereon May 1, 1922. Afterwards, while this action was pending, but before trial, the exchange rescinded its apportionment. There were two audits of the demurrage account after this action was brought, one presenting the view of the exchange, and the other the view of the railway company. The latter was apportioned by J. F. Shaffer, acting commissioner of the exchange, and there was found to be due by the fuel company to the railway company $8,628.35, instead of $10,668.43 sued for. Under the exchange audit the amount found to be due by the fuel company was $915.39.

Clearly the railway company had a cause of action at the time this action was brought, and this could not be taken away by any subsequent action of the exchange in behalf of its members against the rights of

and the consideration had moved from him to the party making such covenant or promise. In such action the covenantor or promisor shall be permitted to make all defenses he may have, not only against the covenantee or promisee, but against such beneficiary as well."

the railway company. Even upon its own reaudit, there was due $915.39 by the fuel company to the railway company. If it be conceded that the fuel company might point out mistakes in the demurrage account and in the apportionment, it could not come into court admitting a liability for $915.39, and ask the dismissal of an action properly instituted. The action of the exchange in rescinding its first apportionment bears no resemblance to that of a defendant who pleads payment, accord and satisfaction, or other matter in bar, arising since the action was brought. The case is more nearly like that class of cases of which *Mills & Fairfax* v. *Norfolk & W. R. Co.*, 90 Va. 523, 19 S. E. 171, and *Condon* v. *Southern R. Co.*, 15 Gratt. (55 Va.) 302, are types. The railway company could not be debarred from the recovery of what was justly due it by the action of the exchange in rescinding its apportionment, nor could the exchange nor the fuel company, by indirection, force upon the railway company their interpretation of the contract. The action was rightly brought. The interpretation of the contract, which will settle the amount of the plaintiff's recovery, if any, is yet to be determined.

[3] The fuel company insists that there can be no recovery on the contract in suit, because the rules of the exchange, which provided for the assessment of demurrage were not filed with the Interstate Commerce Commission; that "under any circumstances, before the provisions for assessing demurrage charges contained in the rules and regulations of the exchange can become binding or legal, they must have been published in the tariffs."

The exchange was the sole consignee of all the coal in question. The tariff rate of demurrage was $2.00 per car per day for all over free time, and this was fixed in

the published tariffs 7777 and 8645. These were the exact rates charged the exchange by the railway company, and accounts accordingly rendered to the exchange. The rates charged were based solely on the tariffs, and no recourse to the rules and regulations of the exchange was necessary to ascertain the amount of the demurrage. Full tariff charges were demanded of the exchange, and the method by which the exchange distributed and collected these charges of its members could not affect the validity of the charges made by the railway company against the consignee.

The rules and regulations of the exchange did not "change, affect or determine" the tariff charges made against the exchange, but after the tariff charges had been determined and fixed, they only affected the apportionment between, and the collection of, these charges, from members of the exchange.

The same question was involved and the same contention made in the following cases, where there were similar tariffs and rules, and was decided adversely to the claim of the fuel company:

In *Norfolk & W. R. Co.* v. *Emmons Coal Mining Co.* (D. C.), 287 Fed. 168, 171, it is said: "It is also objected that the tariffs cannot be construed in accordance with plaintiff's claim, except in connection with the articles and rules of the exchange, and that those rules were not filed with the Interstate Commerce Commission. Examination of the tariff and the rules is not convincing of the correctness of the defendant's contention. Every essential of the railroad company's claim is in accordance with the terms of the tariff itself. * * * The tariff, in my opinion, is complete in itself, and no claim is made for any other service which affects the rates and charges for demurrage and which should necessarily and properly be made part of the

tariff filed under section 6 of the interstate commerce
.act. The charges were not assessed on authority of
the rules, but on authority of the tariff.''

On appeal to the Circuit Court of Appeals in the
same case (*Emmons Coal M. Co.* v. *Norfolk & W. R. Co.*,
3 Fed. 2d ed., 525), it was said: "A study of the tariff
has convinced us, also, of the lack of force in defend-
.ant's further contention that plaintiff's claim is in-
valid because based upon the tariff *and* the rules of the
Lamberts Point Coal Exchange, not upon the tariff
alone. We quite agree with Judge Thompson, whose
order in the subject matter of the instant writ of error,
when he points out in his opinion that, while certain
substitutions of coal may have been made under the
rules of the exchange, the demurrage charges were
assessed entirely on authority and by virtue of the
tariff. The substitution of cars of one member for
those of another, a matter of bookkeeping, was by
authority of the coal exchange agreement, but the
charges sought to be recovered by plaintiff were
assessed only under tariff provisions which provide for
demurrage from the end of the free time until the coal
was ordered out by the shipper. Such provisions have
not been essentially affected by the fact that there was
a substitution of cars among members of the exchange
when the situation thereafter between the shipper and
the railroad is the same as before substitution, in that
the former continued to have title to an amount of
coal equal to that originally shipped by him and the
latter continued to have its cars detained, although
not the identical cars, until the former ordered his coal
unloaded.''

In *Wholesale Coal Trade Asso.* v. *Director General*,
58 I. C. C. R. 15, it was said: "Under the rules of the
Tidewater Coal Exchange, shipments forwarded to the

pools at the different piers were consigned to the exchange which entered into the average agreement with the carriers as to each pier. A similar practice was followed with respect to the anthracite pools, which were voluntarily maintained by shippers. The pool agreements provided that the demurrage assessed against each pool would be prorated among the members upon the basis of the tonnage loaded into vessels. Later, the demurrage on bituminous shipments was prorated on the basis of the tonnage standing to the credit of the various members of the pool. In some instances the demurrage charges thus apportioned against certain shippers were in excess of those which would have accrued in the absence of the pooling arrangements, and it is contended that such charges are not legally collectible from such shippers. When shippers became parties to the pools, they lost their identity from the demurrage standpoint, and so far as the defendants are concerned, they need not look beyond the billed consignee, the exchange, in determining the amount of charges due."

The rules and regulations of the exchange, to which the fuel company assented, created an average agreement among the members as to the demurrage charges. Under their agreement to credit releases by tonnage and not by cars, some cars might have to pay more than $2.00 per car per day, others less, but the *average* of all the cars would be $2.00 per day. This average they agreed to among themselves for the purpose of making up the amount to be paid to the railway company. The railway company charged the exchange, the consignee, $2.00 per day per car.

[4, 5] We conclude that it was not necessary for the rules and regulations of the exchange relating to demurrage charges to be filed with the Interstate Commerce Commission.

It is well settled and may be freely conceded that tariffs are to be construed according to their language, and that the intention of the framers is entitled to little, if any, consideration. Furthermore, in cases of doubt, the language of the tariff is to be construed most strongly against those who frame it. *Boldt* v. *P. C. C. & St. L. Ry. Co.*, 42 I. C. C. R. 308; *Northwestern Steel Co.* v. *Director General*, 68 I. C. C. R. 195; *Carney* v. *Director General*, 68 I. C. C. R. 309; *Republic of France* v. *Director General*, 68 I. C. C. R. 419.

Subject to these qualifications, the interpretation of a written tariff stands upon no different footing from that of other written instruments. Nontechnical words are to be given their usual and ordinary signification, and the instrument is to be read as a whole, and if apparent inconsistencies can be reconciled they should be, in order to give full effect to the language used. It is also entirely legitimate, in seeking to ascertain the meaning of the language used, to consider the end in view, the object sought to be accomplished by the making of the instrument. If in these circumstances the language of a tariff is fairly susceptible of a reasonably plain meaning, that construction should be put upon it. It is not the part of the judicial expositor to inquire whether or not, by strained or forced interpretation of separate words or paragraphs, considered disconnectedly, some other construction might not be possible.

[6] The chief object of demurrage charges is to expedite the transportation of personal property, to keep the means of that transportation actively moving as much of the time as possible. To this end pools have been formed and tariffs published, permitting substitution of detention and the allowance of demurrage credits and debits, and they have proved so efficient

and valuable that it would greatly cripple coastwise and international commerce to seriously interfere with them. These pools were inaugurated by the Government itself during the railroad administration in July and August, 1917. The history of this inauguration is given in *Wholesale Coal Trade Asso.* v. *Director General*, 58 I. C. C. R. 15, but need not be here repeated. It is sufficient to say that pooling was a practical necessity then, and would seem to be still. It has been repeatedly sustained by the Interstate Commerce Commission.

[7] The tariff we are asked to construe is I. C. C. 8645, the pertinent part of which is as follows:

"(b) A car shall be considered as released:

"1. At the time vessel registers for the cargo or fuel supply of which coal or coke dumped into such vessel is a part, except that when cars are unloaded before the vessel registers, such cars shall be released when unloaded.

"2. The date shipments are transferred by written order and acceptance to another party shall be considered the date of release of the car for the account of the original consignee, and the detention shall follow the car and be charged in the account of the new consignee.

"3. Any fraction of a day will be computed as one day.

"4. To reduce switching service and prevent delays, cars subject to the rules of this tariff may, at the option of the railway company, be delivered otherwise than in the order of their arrival. In this event the dates on which the substituted cars are delivered will be used in computing the detention of the cars for which they are substituted so that as far as credit and debit days are concerned, the record will be the same

as though the cars were being delivered in the order of their arrival."

Tariff 8645 was a substitute for 7777 and went into effect March 29, 1921.   Clause 4 of tariff 8645 did not appear in tariff 7777.

Before considering the interpretation of the tariff, it may be observed that the Interstate Commerce Commission had before it for consideration in *Smokeless Fuel Co.* v. *Norfolk & Western R. Co.*, 85 I. C. C. R. 395, a tariff almost identical with that in the instant case, and held that the tariff and the practice of the railway company thereunder were reasonable and proper.

Clause 1 of rule 3 (b) plainly refers to the common law duty to dump in the order of arrival.   But this dumping could not take place until the vessel was in position to receive the coal, and in order to shorten the period of demurrage, the paragraph provides, in effect, that the demurrage period shall cease when the vessel registers, unless the dumping takes place before the registration, in which event the "cars shall be released when unloaded."   This has reference to cars whose contents are delivered to the vessel before registry.   There is no special significance in the use of the word "except."   The meaning of the paragraph seems too plain to admit of doubt.

Clause 2 is not involved, as there was no transfer of any of the coal in controversy.   If it throws any light on the interpretation of clause 1, it merely confirms the statement that clause 1 is dealing with the common law duties of the carrier.

Clause 3 is in no wise involved.

Clause 4 is that around which the controversy centers.   It is manifest from the mere reading of the clause that the object of it was, and the meaning of the

words used imports, that a different way of discharging its common law duty was to be provided from that provided by clause 1, or else a substitute for it.   A new and different state of facts were provided for in which both the carrier and the shipper were interested. The carrier desired to avoid the large amount of switching involved in carrying out its strict common law duty in the ordinary way, and also to release its cars at an earlier date; the shipper to prevent delays in loading his ship.   While the registry of the ship would stop railroad demurrage, it would not stop ship demurrage, which in one of the cases cited was three cents per ton per day of the ship's tonnage, in another as much as $5,000 per day.   The shipper also had the advantage, under the average agreement, of loading his ship as soon as his cars were started from the mines.   The object to be accomplished was not merely to "reduce switching," but also to "prevent delays."   The benefits were mutual.

The fuel company insists that when a substituted car (one of later arrival) is actually dumped into a ship, it is released under clause 1, and that the car for which it is substituted is also released by virtue of the substitution, that this is the price paid by the carrier for the privilege of substitution.   If this be true, then there has been no substitution.   The effect of the argument of the fuel company is that practically for every car dumped under clause 4, two cars are released from demurrage debits, although the railroad company has the use of only one of them.   This loses sight of the prime object of demurrage charges and especially fails to give effect to that provision of clause 4 declaring: "In this event the dates on which the substituted cars are delivered will be used in computing the detention of the cars for which they are substituted,

so that as far as credit and debit days are concerned, the record will be the same as though the cars were delivered in the order of their arrival." The substitution of the cars of one member for those of another is a mere "matter of bookkeeping" authorized by the exchange agreement.

Rule 3 is a demurrage tariff intended to expedite transportation, and it would require very plain and unequivocal language to authorize the release of two cars when only one was dumped and made available for use. The rule does not contain any such language. Clause 1 of rule 3 (b) refers to dumpings in the order of arrival. Clause 4 to dumpings "*otherwise* than in the order of arrival." A car cannot be dumped in the order of arrival and also *otherwise* than in the order of arrival. The facts of the particular case must determine whether the dumping is to be done under clause 1 or clause 4. The two clauses cannot be applied to the same cars at the same time. The substitution provided for by clause 4 is of substantial benefit to shippers in permitting one car to be substituted for another, and in changing the date from which detention begins. Reading the rule as a whole, we find no authority for the contention that the dumping of the substituted car operates to release not only that car but also the one for which it is substituted. It is no hardship on the shipper, and contravenes no rule of law, to require him to pay for the actual detention of cars holding his coal.

This accords with the view of the Interstate Commerce Commission in construing a substantially similar tariff. In *Smokeless Fuel Co.* v. *Norfolk & Western R. Co.*, 85 I. C. C. R. 395, 399, it is said: "While the tariff is clumsily worded, there can be no doubt that defendant's construction is in accord with its intent

and that, so for as equity is concerned, complainants' contentions are without merit. However, a tariff must be strictly construed. In our opinion, defendant's interpretation is correct. Paragraph 1 provides that a car shall be considered as released 'at the time vessel registers for the cargo or fuel supply of which the coal * * dumped into such vessel is a part,' and paragraph 2* permits the substitution of any car containing a similar grade of coal for the one ordered dumped. The substitution of dates is merely a bookkeeping arrangement. The exception contained in paragraph 1 can release a shipper from demurrage only when the car which is unloaded contains tonnage, equivalent or otherwise, which becomes a part of the cargo or fuel supply of the vessel as a result of his order. If such cars are thus unloaded before the vessel registers, the date of such unloading, rather than the date of registration, determines the release of the shipper in the demurrage account. This is the meaning of the rule when read in its entirety.

\* \* \* \* \* \* \* \* \*

"We find that the demurrage charges under attack were legally assessed."

It was said by the Circuit Court of Appeals (third circuit) in *Emmons Coal Mining Co.* v. *Norfolk & Western R. Co., supra,* construing a similar tariff:

"In its interpretation of the tariff, defendant cites rule 5-b-1, *supra,* to sustain its contention that demurrage cannot be collected after the shipper's car has been unloaded, pursuant to an order of another. That part of rule 3 provides that a car shall be considered as released at the time the vessel registers, 'except that

---

*Paragraph 2 in this case corresponds to paragraph 4 in the instant case.

when cars are unloaded before the vessel registers, such cars shall be released when unloaded.' This interpretation of the rule is plainly not justified by an examination of the context. The exception in 3-b-1 is intended to cover the unloading of the coal into the vessel prior to the registry, not the dumping of the car of one shipper as the equivalent of that ordered to be unloaded by another. The vice of the defendant's interpretation is almost shown by its result, namely, that where a car of one shipper has been dumped pursuant to the order of another, the cars of both shippers would be released despite the fact that one would still remain in the railroad yards.

"The defendant's interpretation of paragraph 3 .of rule 3-b, *supra*, as affecting equivalent shipments on the part of members of the coal exchange, is also not justified. No transfers 'by written order and acceptance;' such as are contemplated by the rule, are under consideration in the present issue, and the section cannot be cited as authority for defendant's claim that it was released from the demurrage claimed in the present action.

"As we read the tariff, we are satisfied that it plainly contradicts defendant's contention that it absolves the defendant from payment of demurrage upon cars involved in substitution of cars of another member of the coal exchange. Some clauses of it, each read by itself, may be lacking in clarity; but, read in conjunction with the entire context, they quite clearly sustain the interpretation of the plaintiff company."

[8] It was urged on behalf of the fuel company that the railway company furnished a limited service and that the contract was invalid unless the shipper was given the option of a lower rate, by analogy to contracts limiting common law liability; citing 10 C. J. 149,.

and *Cincinnati, &c. R. Co.* v. *Rankin,* 241 U. S. 319, 36 S. Ct. 555, 60 L. Ed. 1022, L. R. A. 1917 A, 265. We need not discuss the distinction between liability and service, for, in the instant case, no limited service was contracted for or performed. The service contracted for and performed was the transportation of the coal and its delivery into the vessel. The value of the service to the shipper was not lessened or impaired, nor the liability of the carrier in any way diminished by dumping the cars out of order. The shipper received the service contracted for, and was not concerned with the amount of labor necessary to render the service. The Chesapeake and Ohio Railway Company owns and operates two lines between Clifton Forge and Richmond—the main line and the James River division. Over the latter it can haul probably twice as much coal with one engine as over the main line. It would hardly lie in the mouth of a Richmond shipper to raise a question as to which line his coal was shipped over, or which cost the carrier most. If the coal was carried from Clifton Forge to Richmond, the service contracted for was rendered, in the absence of a special contract to carry over a particular line.

[9, 10] It is insisted by counsel for the fuel company that no recovery can be had in this action because the amount sued for and for which judgment was rendered is different from the amount of demurrage charges that would be assessable against this defendant under the filed tariff based on its car record and also different from what the charges would be if defendant had not been a member of the Newport News Coal Exchange, and the charges had been assessed under the plaintiff's applicable tariff on file with the Interstate Commerce Commission.

It is admitted by the railway company that it could

not, under its tariff, assess against the fuel company a *rate* greater or less than that prescribed by its tariff, but it insists that so long as the *tariff rate* is maintained, it is within its rights, although in consequence of the pooling agreement the *amount* actually paid by one in the pool is less than that paid by one without the pool, and this appears to be correct.

Pools similar to the one involved in the instant case, carrying a provision for demurrage debits and credits, have not only been repeatedly recognized as valid by the Interstate Commerce Commission, but a pooling agreement substantially the same as the one we are considering was recommended by the commission to the Norfolk and Western Railway Company, to be operated at Lambert's Point, early in 1920, in order to "avoid excessive switching and promote release of equipment at the ports." *Smokeless Fuel Co. v. Norfolk & W. R. Co.*, 85 I. C. C. R. 395.

Rule 4* of the tariff of the railway company accords with the suggestion of the commission, provides the method for computing demurrage charges, and limits the use of excess credits.

Clause 7 of section 6 of the interstate commerce act provides: "Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passenger or property or for any service in connection therewith, between the

---

*"RULE 4, DEMURRAGE CHARGES.

"Settlement shall be made on basis of the detention to all cars released during the month. The date of arrival notice shall be subtracted from the date of release. From the total days detention to all cars thus obtained under rule 3 deduct five (5) days free time allowance for each car, except on cars containing coke for export, deduct ten (10) days free time allowance for each car; the remainder, if any, will be the number of days to be charged at the rate of $2.00 per car, per day. Excess credit days of any month cannot be deducted from excess debit days of another month."

points named in such tariff than the rates, fares and charges which are specified in the tariff filed and in effect at the time, * *." U. S. Comp. St., section 8569.

The coal exchange was the common consignee of all the coal shipped, and the demurrage bills which were rendered monthly to the exchange were compiled under the tariff in the same manner as demurrage was compiled and assessed against other shippers outside of the exchange. This was no departure from the "rates, fares and charges which are specified in the tariff filed and in effect." It is true that after the bill for demurrage was rendered to the exchange it was to be apportioned among, and to be paid by, the members as provided in the pool agreement, but this did not affect the validity or correctness of the charges. The distribution of the amount was simply the result of a valid pool arrangement. Pooling is open to all shippers, and a shipper may enter a pool or not as he chooses. If the *rate* is the same to a shipper out of a pool as to one in a pool, it cannot be a valid objection that, in consequence of the pool arrangement, the *amount* paid by one in the pool is less than that paid by one not in the pool. Otherwise, there could be no valid pools.

[11] The interstate commerce act was enacted to secure equality of rates, and so long as the carrier collects its full *tariff rate*, there is nothing in section 6 to prohibit several shippers from entering into an average demurrage agreement whereby the *amount* paid by the several members of the pool is *different* from what they would have had to pay if operating out of the pool. Compare *Meeker* v. *Railroad Co.,* 66 I. C. C. R. 657; *Smokeless Fuel Co.* v. *Norfolk & W. R. Co., supra.*

In *Wholesale Coal Trade Asso.* v. *Director General,* 58 I. C. C. R. 15, it is said: "When shippers become parties to the pools, they lose their identity from a demurrage standpoint, and so far as the defendants are concerned they need not look beyond the billed consignee, the exchange, in determining the amount of the charges due."

We conclude that the method of computing the demurrage adopted by the railway company, in conformity to its published tariff, is not prohibited by the interstate commerce law.

[12, 13, 14] Finally, it is claimed by the fuel company that clause 4 of rule 3 (b), so often referred to, never appeared in the demurrage tariffs of the railway company filed with the Interstate Commerce Commission until March 29, 1921, and hence the substituted service therein provided for cannot form the basis of demurrage charges for the months of January and February, 1921.

If the right to make this charge were a mere matter of contract, abundant authority therefor would be found in the contract between the Smokeless Fuel Company and the Newport News Coal Exchange, Inc., which was entered into before any of the shipments were made by the fuel company, and upon which we have seen the railroad company has the right to sue; but it is not a mere matter of contract. It is to be determined by the published tariff. Rule 4 of the tariff 7777, as well as 8645, fixes the rate of demurrage at $2.00 per car per day, and seemingly contemplates some sort of average demurrage agreement. The railroad company had no choice in the matter of making the demurrage charge so fixed by the tariff against every shipper over its road. It sufficiently appears that such charges were contemplated by the rules and

regulations of the exchange, which first became effective June 1, 1920, and it is to be inferred that the demurrage charge of $2.00 per car per day was made against every shipper from the effective date of tariff 7777. The railroad company could not waive the right to make the charge, without creating a preference forbidden by law, and it is not to be presumed that such waiver was made. It is claimed by the railroad company that the question here at issue was not, and could not under the pleadings have been, raised in the trial court. At all events, we do not find that the trial court considered and determined whether or not any demurrage accrued under tariff 7777, or that the case was so developed that the trial court could have determined that question. The matter is one that affects the public interest, and is of such importance to the parties that we deem it best to remand the case to the trial court for a new trial on so much of the account sued on as embraces the right to recover demurrage charges for the months of January and February, 1921.

The judgment of the trial court will be set aside, and judgment entered in this court in favor of the Chesapeake and Ohio Railway Company against the Smokeless Fuel Company for the sum of $251.09, with legal interest thereon from October 1, 1921, until payment—being the demurrage charges for the month of September, 1921—and the case remanded for a new trial as to the demurrage charges for January and February, 1921. Judgment will also be entered in favor of the defendant in error against the plaintiff in error for its costs.

*Reversed and remanded.*