# Richmond.

## J. Aron and Company, Incorporated, v. The Chesapeake and Ohio Railway Company.

January 16, 1930.

Absent, Chichester and Epes, JJ.

The opinion states the case.

*Gibbs L. Baker, J. Winston Read* and *Tazewell Taylor*, for the plaintiff in error.

*Henry Taylor, Jr.,* and *Chas. E. Ford,* for the defendant in error.

CAMPBELL, J., delivered the opinion of the court.

This is a proceeding by notice of a motion for judgment brought by the Chesapeake and Ohio Railway Company against the plaintiff in error (hereinafter called defendant), to recover the sum of $3,274.82 due by reason of alleged car demurrage.

The basis of the company's claim is set forth in an original and an amended notice of motion for judgment. The original notice of motion was returned to the clerk's office on the 13th day of April, 1922, and was for the recovery of demurrage charges for the months of December, 1920, January, February and March 1921, and reads in part as follows:

"TAKE NOTICE: That The Chesapeake and Ohio Railway Company, a corporation, will move the Circuit Court of the city of Newport News, on the first day of May, 1922, for a judgment against you in the sum of nineteen hundred and twelve dollars ($1,912.00) with

interest on eighteen hundred and fifty-six dollars and thirty-one cents ($1,856.31) from March 1, 1922, which is demurrage, and fifty-five dollars and sixty-nine cents ($55.69) is war tax thereon, all of which is on account of coal shipped by you over said railroad, consigned to the Newport News Coal Exchange, at Newport News, Virginia, of which you were a member and subscribed to and are bound by the rules and regulations of said coal exchange."

On the 27th day of July, 1927, over the objection of the defendant, the company was permitted by the court to file the following amended notice of motion:

"Amended Notice of Motion.

"1.   Take Notice: That The Chesapeake and Ohio Railway Company, a corporation of Virginia, will move the Circuit Court of Newport News, Virginia, on the 1st day of May term, 1922, for a judgment against you in the sum of three thousand, two hundred and seventy-four dollars, eighty-two cents ($3,274.82), with interest on two thousand eight hundred fifty-seven dollars, seventy-seven cents ($2,857.77), a part thereof, from April 1, 1921, until paid; with interest on four hundred seventeen dollars five cents ($417.05), another part thereof, from May 1, 1921, until paid.

"2.   Said sum is due for demurrage as apportioned by a recheck of the same on account of coal shipped by J. Aron & Company, Incorporated, or for its account consigned to the Newport News Coal Exchange, at Newport News, Virginia, of which J. Aron & Company, Incorporated, was during the time said demurrage accrued a member and subscriber to and was bound by the rules and regulations of the said coal exchange.

"3.   That the tariffs under which this demurrage accrued and statement of which was duly rendered to

the Newport News Coal Exchange by the Chesapeake and Ohio Railway Company are C. & O. Tariffs I. C. C. 7777 and I. C. C. 8645.

"4. That amongst the rules and regulations of the Newport News Coal Exchange is rule No. 17, being as follows:

" 'Demurrage Bills.

" '17. The Chesapeake and Ohio Railway Company will submit a statement to the exchange at the close of each calendar month, as required by its tariffs, itemized to show dates of arrival and release of cars, covering total demurrage accruing against the exchange during the month. The exchange will compile car or tonnage days detention accounts against each member and apportion to each member having car or tonnage days detention during the calendar month in which the demurrage accrued, his proportion on the basis of his car or tonnage days detention, as compared to the total car or tonnage days detention. Bills to individual members will then be rendered by The Chesapeake and Ohio Railway Company in accordance therewith, and payment must be made by members immediately upon receipt of bill'—

"—as will appear from said rules which were duly signed, and said rules and regulations duly agreed to by J. Aron & Company, Incorporated, on the 4th day of October, 1920.

"5. That on the . . . . . . . . day of . . . . . . . . . . , 19 . . . ., agreed with The Chesapeake and Ohio Railway Company, through its General Agent at Newport News, as follows:

" 'Newport News Coal Exchange, Inc.
" 'Agreement—Form 'B.'
· "Dated at........192...
" 'To Mr. L. C. Spengler, General Agent,
" 'The Chesapeake & Ohio Railway Company,
" 'Newport News, Virginia.
·" 'Dear Sir:
" 'Until further notice you are hereby authorized to accept from the commissioner, or deputy commissioner of the Newport News Coal Exchange, Incorporated, his written orders to deliver to any vessel any coal for Tidewater shipment or vessel fuel received at your station, consigned to "Newport News Coal Exchange, Incorporated," for account of the undersigned.

.............................
(Name of Exchange Members.)
" 'Per.......................'

"6. That on the 4th day of October, 1920, J. Aron & Company, Incorporated, agreed with and promised The Chesapeake and Ohio Railway Company, as per letter to the general agent of The Chesapeake and Ohio Railway Company at Newport News, as follows:

" 'Newport News Coal Exchange, Inc.,
" 'Agreement—Form "C." C. & L. C.
" 'Dated at New York, October 4, 1920.
" 'To Mr. L. C. Spengler, General Agent,
" 'The Chesapeake and Ohio Railway Company,
" 'Newport News, Virginia.
" 'Dear Sir:
" 'I (or we) hereby agree to pay all freight charges when way-billed collect; loading charges; and car demurrage charges assigned to me (or us) by authority of the commissioner or deputy commissioner of the Newport News Coal Exchange, Incorporated, on coal shipments going into vessels for my (or our) account at

Newport News, Virginia, under the Newport News
Coal Exchange, Incorporated, agreement, whether
shipped from mines, or obtained elsewhere, for my
(or our) account, or for the account of any other
member of the exchange.

" 'J. ARON & CO., INC.,

" '(Name of Exchange Members.)

" 'Per I. WILKES,

" 'Vice-President.'

"7. Statements for demurrage in accordance with
said rule 17 were submitted to the said exchange by the
plaintiff and the sum of one thousand, nine hundred
twelve dollars ($1,912.00) with interest, as set forth
in the original notice of motion herein, was compiled
and ascertained and apportioned to the defendant by
the said exchange, which amount was certified by the
commissioner of the exchange as correct; and bills
therefor were rendered by the plaintiff for the amounts
shown in said original notice of motion. Since that time
the Supreme Court of Appeals of Virginia, on June 11,
1925 (142 Va. 355, 128 S. E. 624) and June 16, 1927
(149 Va. 13, 140 S. E. 823), in the case of *Smokeless
Fuel Company* v. *The Chesapeake and Ohio Railway
Company* has decided the proper method of calculation
of the said demurrage against this defendant and other
shippers similarly situated, which results in an increase
in the amount of the demurrage, with interest, owing
by this defendant to the plaintiff, as set out in para-
graph 1 hereof:

"8. That J. Aron & Company, Incorporated, agreed
in writing on the 4th day of October, 1920, that it
would pay to the said The Chesapeake and Ohio Rail-
way Company, as per Form 'C' above set forth, said
sum, which amount or any part thereof J. Aron & Com-
pany, Incorporated, has omitted, refused and failed to

pay, so that the said sum of three thousand, two hundred, seventy-four dollars, eighty-two cents ($3,274.82), with interest as aforesaid, is now due and owing to the said The Chesapeake and Ohio Railway Company, for which it asks judgment against J. Aron and Company, Incorporated."

In addition to the general issue and grounds of defense set out in writing, the defendant filed two special pleas to the amended notice of motion, one asserting the three-year limitation prescribed by the act of Congress and the other the five-year limitation prescribed by statute in Virginia. The plaintiff filed general replications to these two pleas. It was conceded, however, that all of the shipments represented cars moving in interstate commerce and that if any limitation was applicable it was the three-year limitation prescribed by act of Congress (49 U. S. C. A., section 16 (3) ). A jury was waived and all matters of law and fact were submitted to the court for its decision. At the conclusion of the evidence the court struck out the two special pleas, on the ground that neither the three nor the five-year statute of limitation relied upon was applicable. The court also struck out all evidence introduced by the defendant, and thereupon entered the judgment here complained of.

The facts of the case at bar are identical with the facts fully set forth in the cases of *Smokeless Fuel Co.* v. *The Chesapeake and Ohio Railway Co.*, 142 Va. 355, 128 S. E. 624, and *Smokeless Fuel Co.* v. *The Chesapeake and Ohio Ry. Co.*, 149 Va. 13, 140 S. E. 823; therefore, we will not deal with them any further.

There are six assignments of error set forth in varying forms, but they present only one proposition of law: Does the amended notice of motion set up a new cause of action, claim or demand, which is equivalent to a

new action, or does the same relate back to the date the original notice of motion was filed?

In support of its contention that the trial court erred in striking out the plea of the statute of limitations of three years,' it is alleged in the petition for a writ of error that each day's demurrage on the new cars appearing in the amended notice constitutes a separate cause of action, and no agreement as to apportionment of demurrage charges can change the tariff provisions which require a carrier to dump cars in the order of arrival. If the defendant were the ordinary consignee against whom suit is brought for demurrage accruing on particular cars consigned to and detained by it, there would be merit in the contention. But such is not the case. Defendant is a member of the Newport News Coal Exchange, Incorporated, and is bound by the rules of the exchange, when not in direct conflict with the tariff regulations.

In the second *Smokeless Case, supra,* it was expressly held that the trial court did not err in refusing to instruct the jury, upon the motion of defendant, as follows: "The court instructs the jury that it was the duty of the railroad company to deliver all cars of the defendant in the order of their arrival. And if the jury believe from the evidence that any cars were delivered otherwise than in the order of their arrival, no demurrage can be allowed on such cars."

In this connection we shall quote at length from the opinion of Chichester, J., in the second *Smokeless Case,* 149 Va. 24, 140 S. E. 823, 826:

"We come now to a consideration of the pertinent parts of the tariff (quoted above), under which the demurrage in this case is charged, and as applied to the facts of this case. So far as the facts are concerned, it is important to remember that the exchange was the

consignee of all the coal that passed through the exchange, and into each pool thereof; so that there is no distinction as to what could have been done under the tariff in this case where the consignee happened to be an individual.

"As was said by the Interstate Commerce Commission in *Wholesale Coal Trade Ass'n* v. *Director General*, 58 Interst. Com. Com'n R. at page 26: 'When shippers became parties to the pools they lost their identity from a demurrage standpoint, and so far as the defendants are concerned they need not look beyond the billed consignee, the exchange, in determining the amount of the charges due.'

"The case is analogous to one (to bring it down to a simple comprehensive basis) where R., a railroad company, delivers to C., a consignee, two cars of coal, to be dumped by the railroad company on the order of C. Car 'A' arrives on the first of the month, car 'B' arrives on the 10th. No order for dumping either car is given until the 15th. In the meantime R. and C. agree that, as only one car is to be dumped at a time, if more convenient to R., R. may dump car 'B' upon the first order and car 'A' upon the second, and that the cars may be released as actually dumped, with debits and credits according to the tariff. On the 15th an order to dump one car is given, and R. dumps car 'B.' On the 20th an order is given to dump car 'A.' Both orders are complied with. The result would be, car 'B,' having arrived on the 10th and being dumped on the 15th, when credited five days free time, would be chargeable with no demurrage. Car 'A,' having arrived on the 1st and being dumped on the 20th, would be chargeable, after a credit of five days free time, with fifteen days demurrage, which at $2.00 per day would be $30.00.

"On the other hand, if the cars had been dumped in order, car 'A,' arriving on the first day and being dumped on the 15th, would have been charged with ten days demurrage—$20.00. While car 'B,' arriving on the 10th and being dumped on the 20th, would have been chargeable with five days demurrage, or $10.00, making the total account $30.00, which is the exact amount of that arrived at under the 'average agreement' plan. C. was in no wise affected, so far as the amount of demurrage is concerned, by the dumping out of order of arrival. The railroad company, as it was bound to do, charged $2.00 per day per car for every day of detention, and it collected no more and no less. The cars were put back into service in exactly the same time as if they had been dumped in order. In other words, every requirement of a demurrage tariff was met, the railroad received compensation for storage in its cars at the legal rate, the consignee was penalized for his detention, and the public interest was protected in the same manner and to exactly the same extent as if the dumping had been in order. The only real difference is in the method of calculating the demurrage. When R. undertakes to collect, however, C. says: 'No, I am not hurt, it is true, the public was protected, and I did agree that you should dump the cars out of order and collect demurrage on the average plan, but under your tariff you forfeit all demurrage unless you dump in order of arrival. You failed to perform your common law duty, and although neither I nor any other interest was hurt by it, this failure technically shifts the fault for detention to your shoulders and you can collect no demurrage even if the actual detention was my fault. You cannot collect for any service you perform, unless you perform it in exact accordance with your tariff,

and in order for you to dump cars out of order and then collect demurrage, your tariff must specifically permit you to do so.' The bare statement of such a proposition is enough to condemn it from the standpoint of right and justice, and we do not think the provisions of tariff 7777 are susceptible of so narrow a construction. There is certainly no express provision in the tariff which required a carrier to dump cars in the order of arrival. It may be conceded that there is a common law duty to dump cars in the order of arrival. The courts generally seem to concede that there exists some such duty on the part of carriers, but it is discussed for the most part as it applies between two consignees under the 'first come first serve' principle. It exists independently of, and outside of, demurrage tariffs. Demurrage is a creature of the tariff, and if the 'dump in order' duty is not made expressly a part of the tariff, it has application in the tariff only because it is the duty of a carrier to minimize demurrage. If the existing tariff does not expressly confine the carrier to the dumping of cars in exact order of arrival, as is the case here, and the method of dumping is not expressly provided for, then the tariff as a whole is open to a construction which may embrace any rule of calculating demurrage which would not increase the aggregate demurrage over the 'dump in order' method."

It is further contended by defendant that the original notice of motion was based on I. C. C. 8645, and that no recovery for demurrage charges could be had, save in accordance with the published tariff in effect when such charges accrued, and therefore, when the plaintiff sought to proceed by way of its amended notice of motion, under tariff 7777, this constituted a departure in pleading and sets up a new cause of action.

The contention of the railway company is that the cause of action in the first notice of motion was the right of the company to have the defendant carry out its promise to pay its proportion of the demurrage due by the exchange to the company, and that the cause of action in the amended notice of motion is exactly the same, namely, the right of the plaintiff to have the defendant pay the apportionment of the statement rendered the exchange, which apportionment it had promised to pay by the execution of form "C" agreement; that the only change made by the amended notice of motion is to increase the amount of the apportionment due by the defendant.

We agree with the contention of the plaintiff. It was the view of this court, in both of the *Smokeless Cases*, that whether calculated under substitution rule 8645 or under tariff 7777, the railway company was entitled to recover the demurrage due under the provisions of the exchange agreement as applicable to the particular case. The question is not under which tariff clause is the action brought, but the question is, was the action brought within the period of limitation applicable to the demurrage actually due?

It has been repeatedly held that, in an amended notice or declaration, merely increasing the damages does not constitute a new cause of action.

In *Merrill* v. *Marietta Torpedo Co.*, 79 W. Va. 669, 92 S. E. 112, 115, L. R. A. 1917F, page 1043, it is said: "Increasing the damages certainly constituted no new cause of action. Courts are very liberal in allowing the plaintiff to amend so long as there is no departure from the original cause of action. There is no departure in this case. Increasing the amount of damages is not a departure."

In *Baltimore S. S. Co.* v. *Phillips*, 274 U. S. 316, 47 S. Ct. 600, 602, 71 L. Ed. 1069, Mr. Justice Sutherland said:

"A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action, so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong. The mere multiplication of grounds of negligence alleged as causing the same injury does not result in multiplying the causes of action. 'The facts are merely the means, and not the end. They do not constitute the cause of action, but they show its existence by making the wrong appear. "The thing, therefore, which in contemplation of law as its cause, becomes a ground for action, is not the group of facts alleged in the declaration, bill or indictment, but the result of these in a legal wrong, the existence of which, if true, they conclusively evince."' *Chobanian* v. *Washburn Wire Co.*, 33 R. I. 289, 302, 80 A. 394, 400 (Ann. Cas. 1913D, 730)."

In our opinion, the cause of action is the failure of defendant to pay its proper apportionment of the bill rendered the exchange by the plaintiff. All that the amendment sought to accomplish was to increase the demurrage charges to the actual amount due by the defendant. The right of action was not barred when the original notice of motion was docketed and all that the amended notice does is to restate the same cause of action based upon an increase in demurrage charges.

We are of opinion to affirm the judgment of the lower court.

*Affirmed.*