Syllabus.

# Richmond.

## PAUL L. JAMES AND W. W. HOUSTON, PARTNERS, TRADING AS PAN-HANDLE COAL COMPANY v. NORFOLK AND WESTERN RAILWAY COMPANY.

October 1, 1925.

1. CARRIERS—*Demurrage—Whether Coal Exchange or Owner of Coal Liable for Demurrage—Case at Bar.*—A coal exchange, a voluntary association of tidewater shippers, in charge of an exchange manager who kept the records of cars of coal in the various pools to the credit of different consignee members, was neither the shipper nor the consignee of any of the cars of coal which went into the pools, and therefore, not liable for demurrage. The carriers performed no services for the coal exchange, and the title to the coal was in the consignees.

2. CARRIERS—*Demurrage—Coal Exchange—Pooling—Case at Bar.*—In the instant case, an action by a railroad for demurrage against owners of coal pooled at tidewater, the defendants claimed that the demurrage charged was illegal because such charge could only be predicated upon a tariff filed with the Interstate Commerce Commission. There was no special service given the shipper into the pool, nor any discrimination against any other shipper. While certain substitutions of cars were made under the rules of the exchange, the demurrage charges were assessed entirely on authority and by virtue of the tariff. The substitution of cars of one member for those of another, a matter of bookkeeping, was by authority of the coal exchange agreement, but the charges sought to be recovered by the railway company were assessed only under the tariff provisions, which provide for demurrage from the end of the free time until the coal was ordered out by the shipper. The substitution of cars of coal under the rules of the exchange and the assessment of demurrage was legal and proper.

3. DEMURRAGE—*Definition—Shippers of Coal to Tidewater.*—Demurrage is the charge against the consignee for detention of cars, and in case of shippers of coal to tidewater the free days of cars and the debit days were calculated and balanced at the end of each month to ascertain the shippers' liability for demurrage.

4. CARRIER—*Demurrage—Substitution of Cars.*—Rule 3(b) 2 (Interstate Tariff Commission tariff 8645) of Interstate Commerce Commission

makes express provisions for a demurrage charge in the case of substitution of cars, and although the substitution there provided for, relates to the cars of the same consignee and may be made without his consent, it demonstrates from the tariff itself that the substitution of cars is only an administrative matter, and does not bring about a different demurrage charge than that which is provided for in the filed tariff.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Thomas W. Shelton* and *Alfred Anderson,* and *Gibbs L. Baker, Karl Knox Gartner, Thos. R. Rutter,* and *Christopher B. Garnett,* for the plaintiff in error.

*Hughes, Little & Seawell,* for the defendant in error.

Christian, J., delivered the opinion of the court.

Paul L. James and W. W. Houston, partners trading as Pan Handle Coal Company, were shippers of coal from West Virginia over the Norfolk and Western railway, to the railway company's piers at Lambert's Point, Virginia, where the coal was trans-shipped by being dumped into vessels, or reconsigned for local or inland trade. This suit arose out of the trans-shipment of coal by vessel.

The assembling of a cargo of coal in cars at a port for the arrival of a vessel to receive the cargo usually entails delay of some of the cars at the piers, pending the arrival of the remaining cars to complete the cargo; or entails the delay of the vessel pending the arrival of the cars; or entails the holding of all cars pending the arrival of the vessel; or all of these various delays.

It is therefore customary for the railroads to provide in their demurrage tariffs a certain free time. The tariff of the Norfolk and Western Railway Company accordingly provided for five days free time per car and also excluded holidays and Sundays.

Carload shipments of coal on arrival at railroad tidewater terminals are classified on different tracks according to grade and consignee-ship. . It is apparent there will be as many different classifications as there are grades of each consignee.

Trans-shipment of coal at railroad tidewater terminals entails the practical problem of assembling carload units into cargoes and bunker lots, with as little delay as possible to cars or vessels. During the war the scheme of pooling coals of the same grade was developed, so that carloads of coal of a given grade might be dumped on the order of any consignee who had sufficient coal of that grade in the pool, without regard to the ownership of the particular cars. An important object attained by pooling coal was the reduction of the number of classifications to the number of different grades of coal (no longer multiplied by consignees), so that all the cars of coal of each grade were assembled upon tracks set apart for that particular grade of coal without regard to ownership of the particular cars; but a record was kept of the number of cars of each consignee in the pool, with the date of their arrival and other facts, which were known as credits.

In order to make the pooling arrangements effective, the Lambert's Point Coal Exchange was established among the tidewater shippers. This association was voluntary, in charge of an exchange manager, who kept the records of cars of coal in the various pools to the credit of different consignee members. Each member of the exchange agreed to swap cars of coal of the same

grade with the other members. The members of the exchange got credit for cars of coal as soon as the cars passed the Bluefield, W. Va., scales, instead of upon arrival at Lambert's Point piers, but each shipper was responsible for the tariff charges, including demurrage.

The plaintiffs in error and thirteen other members of the exchange became indebted to the railway company in various amounts for demurrage under its filed tariff, and proceedings by motion for the recovery of judgment against each consignee shipper was brought in the Circuit Court of the city of Norfolk, Virginia. The issues and evidence in the cases being the same, that of the plaintiffs in error was, by agreement, submitted to the trial court without a jury as a test case. The court entered judgment in favor of the plaintiff against the defendants for the sum of three thousand six hundred and thirty-four dollars and twenty-five cents ($3,634.25), with legal interest on $3,212.00 thereof from the 10th day of November, 1923, till paid, and its costs by it about its suit in this behalf expended. For alleged erroneous rulings by the trial court (properly preserved in the record), during the trial of the case, and entering judgment for the plaintiff, a writ of error was granted and the case is before us for review.

Under Exchange Rule 23, the shipper in shipping his coal to a particular pool was required to have it billed:
"To_____, care of
Lambert's Point Coal Exchange, Pool No. _____."

When the cars arrived at Lambert's Point they were not segregated in accordance with the ownership of the coal, but were physically commingled with the cars of all the other members. The individual member having a book credit in the exchange or pool had the right to have the exchange order equivalent tonnage dumped from these common cars into his vessel.

[1] The plaintiffs in error most earnestly press upon this court's attention that the trial court erred in not holding, as a matter of law, that the Lambert's Point Coal Exchange was the common consignee of all the coal shipped to it by its members, so far as the applicable demurrage tariff was concerned. This claim was presented to the trial court by demurrer as well as upon the trial on the merits, and it will be considered here as a single assignment of error.

The plaintiffs in error contend that the United States Supreme Court, in the so-called "Forwarding Case" (*I. C. C.* v. *Delaware, Lackawanna and Western Railway, et al.*, 220 U. S. 235, 31 S. Ct. 392, 55 L. Ed. 449) has ruled on this point directly, and it is the doctrine of this decision on which they rely to sustain their position.

The "Forwarding Case" grew out of the following state of facts: The railway companies, in their published tariffs, promulgated a through rate upon certain articles in carload lots at much less than the same articles in less than carload lots. Whereupon a practice grew up of shippers of articles in less than carload lots assembling their goods at a central point, where a shipping agent combined the goods in carload lots, and shipped them to some common point near their several destinations, consigned to the shipping agent, where, upon arrival, the goods were unloaded and reshipped in less than carload lots to their ultimate destination. The forwarding agent and the shipper divided the difference between the amount of freight on carload lots and that on less than carload lots.

This practice became so general, that it developed into an established business known as the forwarding business. The railroads, with the design to break up this business, presented to the Interstate Commerce Commission a qualification of their tariffs to the effect

that unless the shipper was the owner of the goods shipped, he could not get the advantage of carload rates, and requested that said qualification might become a part of their tariffs. The Commission refused to allow the qualification because discriminatory and unreasonable, thereupon the railroads appealed to the courts. The case finally reached the Supreme Court where the ruling of the Commission was sustained upon the principle that the carrier may not discriminate in fixing the charge for carriage where there is no difference inhering in the goods or in the cost of the service rendered in transporting them; or, what is equivalent thereto, that the carrier did not have the right to make the ownership of goods the criterion by which his charge is to be measured.

The Lambert's Point Coal Exchange was neither the shipper nor the consignee of any of the cars of coal which went into the pools, but the voluntary agency of the shippers which kept the records of cars to the credit of the various members in each pool, and through its general manager gave orders to the carrier to dump the equivalent coal of the consignee into the vessel which berthed to receive and transport the coal of that particular consignee. The coal was shipped from the mines, consigned to the particular members of the coal exchange, who paid the freight to the carrier and assumed all the obligations under the tariffs, and gave notice of the arrival of the vessel to receive his coal to the general manager of the exchange, who gave instructions to the carrier to dump equivalent coal, if the consignee had sufficient to his credit in the pool. The carrier performed no service for the coal exchange and the title to the coal was in the consignee, therefore the principle of the "Forwarding Case" is not applicable to this case, and the court did not err in overruling the

demurrer of the plaintiffs in error, nor their contention on the merits that the Lambert's Point Coal Exchange was consignee of the cars of coal and alone liable for the demurrage.

The purpose of the organization of the Lambert's Point Coal Exchange was to reduce coal classifications and necessary switching, and to facilitate dumping, thereby expediting the despatch of vessels and augmenting car supply at the mines; and (a) to act as an agency for the pooling of coal, and to execute to the Norfolk and Western Railway Company orders of the members for delivery of tonnage to vessels, permitting the use by a shipper of coal of the same pool to which the member has made shipment, and to the extent of such contributions, without being required to apply on the delivery order of a member the individual coal consigned to him; and (b) to maintain a complete record of all shipments of coal consigned by the members in the various classifications and of orders received from members and executed to the railway company covering delivery of coal to vessels.

[2] The entire organization was based on the theory that the unloading of cars of coal of one shipper on the order of another, as permitted by the rules of the coal exchange, did not release the first shipper from demurrage thereafter under the tariff rules of the railway company. It is true that the tariff rules do not provide for the substitution of the cars of coal of one shipper for those of another, and the transfer of any demurrage charge to the cars of the shipper still being detained; besides the literal construction of rule 3 of the tariff, which provides for the method of computing time for the detention of cars, and when same are released, would indicate that demurrage accrues against the identical car of coal except in one instance hereinafter noted.

The shippers into the pool vouching the fact that the tariff does not provide for the rules of the exchange, and relying upon the strictest construction of rule 3, to the effect that demurrage is a charge against the coal in the identical car, claim that the demurrage charged against them is illegal under the following well established rule of law: "That a demurrage charge can only be predicated upon a tariff filed with the Interstate Commerce Commission, and that any other contract, rule or regulation which would bring about a different charge than that which is provided for in the filed tariff, is illegal and unlawful and in violation of section 6 of the Interstate Commerce Act [U. S. Comp. st. section 8569]."

Careful study of the tariff and the rules of the exchange, in the light of the above rule of law, convinces us that the demurrage charges are legal and properly assessed. There is no special service given the shippers into the pool nor any discrimination against any other shipper. While certain substitutions may have been made under the rules of the exchange, the demurrage charges were assessed entirely on authority and by virtue of the tariff. The substitution of cars of one member for those of another, a matter of bookkeeping, was by *authority of the coal exchange agreement*, but the charges sought to be recovered by the railway company were assessed only under the tariff provisions, which provide for demurrage from the end of the free time until the coal was ordered out by the shipper. Such provisions have not been essentially affected by the fact that there was a substitution of cars among members of the exchange, when the situation thereafter between the shipper and the railway company is the same as before substitution, in that the former continued to have title to an amount of coal equal to that originally shipped by him, and the latter continued to have its

cars detained, although not the identical cars, until the former ordered his coal unloaded.

[3] Demurrage is the charge against the consignee for detention of cars, and in case of shippers of coal to tidewater the free days of cars and the debit days were calculated and balanced at the end of each month to ascertain the shippers' liability for demurrage.

In the case of the *Smokeless Fuel Company*, *et al.* v. *Norfolk and Western Railway Company*, 85 I. C. C. R. the Interstate Commerce Commission held the assessment of the charges in this suit was correct, and in accordance with the tariff, and the tariff itself was deemed reasonable as an administrative matter.

The United States Circuit Court of Appeals for the Third Circuit, in the case of *Emmons Coal Mining Co.* v. *Norfolk and Western Railway Company*, 3 Fed. (2nd series) 525 (1925), held that the substitution of cars of coal under the rules of the exchange and the assessment of demurrage under the tariff of the railway company was legal and proper.

[4] The learned judge of the trial court was of opinion that rule 3 (b) 2 makes express provision for the demurrage charge in the case of the substitution of cars, "the dates on which cars should have been so unloaded * * * * will be substituted for the dates on which equivalent tonnage was actually delivered and the detention will be computed on the basis of such substituted dates." Although the substitution here provided for relates to cars of the same consignee and may be made without his consent, it demonstrates from the tariff itself that the substitution of cars is only an administrative matter, and does not bring about a different demurrage charge than that which is provided for in the filed tariff.

At its June term, 1925, the Supreme Court of Appeals

in a very able and learned opinion by Burks, J., in the case of *Smokeless Fuel Company* v. *Chesapeake & Ohio Railway Company*, 142 Va. 355, 128 S. E. 624, approved the law as laid down and the decisions in the cases of *Smokeless Fuel Company* v. *Norfolk and Western Railway Company* and *Emmons Mining Company* v. *Norfolk and Western Railway Company*, *supra*, but the court remanded the case for a new trial because the trial court had not considered and determined whether or not any demurrage accrued under tariff 7777. In the case before us all questions involved were presented and ably discussed before the trial court, and by it correctly decided.

There is no error in the judgment of the trial court and the same will be affirmed.

*Affirmed.*