# 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

## EASTERN COAL AND EXPORT CORPORATION v. NORFOLK AND WESTERN RAILWAY COMPANY.

### June 16, 1927.

1. DEMURRAGE—*Transfer of Consignment—Coal Exchange Pool—Case at Bar.*—The instant case was an action upon a demurrage claim by a railroad company against a coal company. The coal in question was consigned to the coal company, care of Lambert's Point Coal Exchange. On November 6, 1920, the coal company exchanged 4,300 tons of its coal in pool with another coal company for coal in other pools. The coal company claimed that its liability for demurrage ceased November 6, 1920, the date of its agreement for exchange with the other coal company. The railroad claimed that the coal company could not so escape its liability for demurrage because expressly prohibited by rule 6 of the pooling agreement, and therefore the paragraph of the demurrage tariff relied upon by the coal company had no application. The coal company based its contention upon paragraph 3 of rule 3 (b) of the Norfolk & Western Demurrage Tariff, No. 4056.

   *Held:* That the railroad's contention was sound.

2. DEMURRAGE—*Paragraph 3 of Rule 3 (b) of Norfolk & Western Demurrage Tariff, No. 4056—Transfer of Coal in Pool.*—Paragraph 3 of rule 3 (b) of the Norfolk & Western Demurrage Tariff, No. 4056, does not prescribe the demurrage charge. In case there is a transfer of a shipment from an original to a new consignee, it provides that the obligation to pay the demurrage thereafter accruing is, with the shipment, transferred to and imposed upon the new consignee. The provision necessarily presumes that the original consignee has a legal right to transfer the shipment, but if by a pooling agreement it has parted with this right, the clause in the tariff does not apply.

3. DEMURRAGE—*No Conflict Between Rule 6 of the Lambert Point Pool Exchange and Paragraph 3 of Rule 3 (b) of Norfolk & Western Demurrage Tariff, No. 4056.*—Between paragraph 3 of rule 3 (b) of Norfolk & Western Demurrage Tariff, No. 4056, and rule 6 of the Lambert Point Coal Exchange there is no conflict. Paragraph 3 provides that in cases of a transfer from an original to a new consignee, the obligation to pay demurrage thereafter accruing is imposed upon

the new consignee. The tariff refers to shipments which are both owned and absolutely controlled by the consignee and covers shipments to non-members of the exchange as well as to members; while the exchange rule refers to shipments which while owned are not absolutely controlled by the consignee because that control has been limited by the exchange rule providing that coal once in pool cannot be disposed of to any other members of the pool.

4. DEMURRAGE—*Coal Exchange Pool—Members Bound by Rule.*—A coal company entering into a coal exchange or pooling contract voluntarily and accepting its benefits cannot relieve itself of the consequential burdens, one of which was a rule of the coal exchange that coal once in the pool could not be disposed of to any other member of the pool.

5. DEMURRAGE—*Coal Exchange Pool—Claim that Coal was Shipped to Consignee Without Its Authority—Case at Bar.*—The instant case arose out of a claim by a railroad company against a coal company for demurrage charges. The coal in question was consigned over the railroad to the defendant in care of the Lambert Point Exchange in Norfolk, between November 6 and November 12, 1920. Notices of arrival were given to defendant coal company immediately. The coal was detained in the pool until March 31, 1921, when the claim was made by the coal company that this coal had been shipped to the exchange by the consignor without authority from it. During the period of its detention, the coal was credited on the books of the coal exchange to the defendant coal company, which had daily reports sent to it including this as part of its tonnage coal credit.

*Held:* That if the coal company had promptly notified the exchange or the railway company that it was not the owner of the coal there would have been no justification for the demurrage charge, but as during the period of detention it allowed itself to be designated as the consignee and as its agreement with the exchange obligates the consignee to pay the demurrage, it was liable for the demurrage charges.

Error to a judgment of the Circuit Court of the city of Norfolk in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*S. S. P. Patteson, Tazewell Taylor,* and *Sherlock Bronson,* for the plaintiff in error.

*Hughes, Little & Seawell, W. R. Staples* and *F. M. Rivinus*, for the defendant in error.

Prentis, P., delivered the opinion of the court.

The Norfolk and Western Railway Company, hereafter called the railway company, upon a claim for demurrage, has recovered of the Eastern Coal and Export Corporation, hereafter called the coal company.

The case is one of many growing out of delays in the transshipment of coal consigned to the coal company, care of Lambert's Point Coal Exchange, at Norfolk, and there pooled.

So much has been said with reference to such litigation, based upon the railway demurrage tariffs on coal for transshipment by vessel and pooling agreements, that much of detail will be omitted. In the few cases which will be cited these particulars have been sufficiently stated.

The reply brief for the coal company states that in its view it will only be necessary to deal with assignment of error No. 1, because if its contention made with respect to that assignment is adopted, this will finally dispose of the case. It is equally true that, if not adopted, it disposes of the case in favor of the railway company. In presenting the case for the coal company from this point of view, it is conceded that there is no question now before this court concerning the reasonableness of the tariff, such as was presented to the Interstate Commerce Commission in *Smokeless Fuel Company* v. *Norfolk & Western Railway Co.*, 85 I. C. C. 395. It is also conceded that there is no question of the mathematical correctness of the demurrage, or that the demurrage is computed in accordance with the applicable tariff; or of the legality of the tariff;

or of the application of the so-called substitution rule, such as was reviewed by this court in *Smokeless Fuel Co.* v. *Ches. & Ohio Ry. Co.*, 142 Va. 355, 128 S. E. 624. That these legal questions and their proper application to this case have been settled is apparent. *Pan Handle Coal Co.* v. *Norfolk & Western Ry. Co.*, 143 Va. 865, 129 S. E. 321; *Norfolk & Western Ry. Co.* v. *Emmons Coal Mining Co.* (D. C.), 287 Fed. 168; *Emmons Coal Mining Co.* v. *Norfolk & Western Ry. Co.* (C. C. A.), 3 Fed. (2d) 525; and same case Adv. Ops. Sup. Ct. of the U. S., January 15, 1927, page 345, 46 S. Ct. 254, 71 L. Ed p. ——; *Meeker* v. *C. R. R. Co.*, 46 I. C. C. 657; *Tidewater Coal Exchange, &c.* v. *B. & O. R. R. Co.*, 96 I. C. C. 612.

The claim is divided into three items.

It is conceded that the first item, $2,922.18, with interest, represents demurrage justly due, according to the principles established in the cases referred to.

[1] The second item, $24,429.54, with interest, presents the most important and distinctive question which is here involved. A large amount of coal of the coal company was in the pool at Lambert's Point, and some demurrage had accrued thereon. Then on November 6, 1920, the coal company exchanged 4,300 tons of its coal in pool five with the Algonquin Coal Company (a member of the exchange) for coal in other pools. The Algonquin Coal Company subsequently transferred this pool five coal to the Lake and Export Corporation, which latter company, with the knowledge and acquiescence of the Eastern Coal and Export Corporation, ultimately had it loaded in two vessels for transshipment.

For the coal company it is here claimed that its liability for demurrage on this coal ceased November 6, 1920, the date of its agreement with the Algonquin

Coal Company, while for the railway company it is claimed that the coal company cannot so escape its liability for demurrage, because expressly prohibited by the exchange or pooling agreement. The basis for the coal company's contention is paragraph 3 of rule 3 (b) of Norfolk and Western Demurrage Tariff No. 4056.

This provides: "The dates shipments are transferred by written order and acceptance to another party shall be considered the date of release of the car for the account of the original consignee, and subsequent detention shall be charged in the account of the new consignee, without any free time allowance."

On the other hand, for the railway company it is claimed that rule 6 of the exchange or pooling agreement controls, and that the paragraph relied upon by the coal company has no application. This Rule 6 provides:

"6. Delivery Orders.—The exchange will neither record nor take cognizance of sales of tonnage between members, and, as to distribution of coal once in pool, will only execute orders of a member which call for delivery of tonnage to a vessel, or for reconsignment by rail to the consuming consignee or retail dealer."

So that there appears to be little dispute as to the facts, and the question presented is one of law—that is, as to the proper construction of the tariff and pooling agreement, in view of the undisputed facts.

[2] This clause in the tariff (paragraph 3 of rule 3[b]) does not prescribe the demurrage charge. That is otherwise prescribed. All that this clause thereof refers to or undertakes to do, is this: In case there is a transfer of a shipment from an original to a new consignee, it provides that the obligation to pay the demurrage thereafter accruing is, with the shipment, trans-

ferred to and imposed upon the new consignee. This provision, however, necessarily presupposes and implies that the original consignee has the legal right so to transfer the shipment. If he has by contract legally parted with his right to do so, the clause in the tariff does not apply. It should be emphasized that there was no obligation on the coal company either to enter into the exchange or pooling contract, or to ship its coal to the Lambert's Point Coal Exchange, as the joint agent of the coal shippers and the railway company, so as to ensure its prompt loading and transportation by water. It entered into this contract voluntarily, for a specific purpose and in the promotion of its own interests. It accepted its benefits and should not be permitted to relieve itself of the consequential burdens, except for most compelling reasons. Among these burdens was that imposed by rule 6 of the exchange agreement, which is relied upon by the railway company—i. e., that coal once in a pool could not be disposed of to any other members of the pool, but could only be disposed of by delivery to a vessel for transshipment by water or for reconsignment by rail to some consuming consignee or to a retail dealer.

[3] The coal company undertook to disregard and violate this contract, claiming that the provision (Rule 6) is invalid as violative of the tariff which recognizes such transfers.

We are of the opinion that there is no such conflict. The tariff refers to shipments which are both owned and absolutely controlled by the consignee, while the exchange refers to shipments which, while owned, are not absolutely controlled by the consignee, because that control has been limited by the exchange agreement. This distinction was referred to by the Interstate Commerce Commission in *Smokeless Fuel Com-*

*pany* v. *Norfolk and Western Ry. Co.*, 85 I. C. C. 395, when this was said: "The tariff covered shipments to non-members of the exchange as well as to members. Paragraph 3 of rule 3 (b) has reference to transfers of shipments by written order and acceptance, such as are occasionally made outside of any pooling arrangement."

We conclude, therefore, that there is no conflict between the tariff and rule 6 of the exchange agreement, and hence the demurrage claimed is justly due. This result can be no surprise to the coal company, for during the period when this substantial sum of demurrage was accruing, it was repeatedly notified that its construction of the contract was denied, and it deliberately chose to ignore its contract and assume the risk of this litigation.

[4, 5] The third item of the claim, $2,057.94, with interest, grows out of these circumstances: Nine cars of coal were duly consigned over the railway company's line to the defendant by Virginia Iron, Coal and Coke Company, in care of the exchange at Norfolk. All of the cars arrived. Notices of arrival were given to defendant coal company immediately, and the equivalent of that coal was detained at Lambert's Point in the pool until March 31, 1921, when the claim was, for the first time, made by the coal company that this coal had been shipped to the exchange for it without authority. During the period of its detention, the coal was credited on the books of the Lambert's Point Coal Exchange to the defendant coal company, which had daily reports sent to it including this as part of its tonnage coal credit. There is no dispute that the demurrage for this period of detention has been properly calculated. It should be remembered always that demurrage charges are permitted, not for the purpose

of producing revenue for the railway company, but that the equipment of the railroad may be required to be unloaded and so promptly released for transportation service; and this in the public interest, so that the railroads may better discharge their public duties.

If and when the defendant coal company was advised of this credit in the pool, it had promptly notified the exchange or the railway company that it was an erroneous credit, there would have been no justification for this charge. For some unexplained reason, it failed to give this notification, and from the dates of the arrival of these cars, between November 6 and November 12, 1920, until March 31, 1921, it accepted the credit. It certainly had the disposition of this coal for the time being, and is therefore responsible for the detention of the cars detained during that period. Unless it is also responsible for this demurrage, then there is no person or corporation from whom it can be collected. During this period it allowed itself to be designated as the consignee, and its agreement with the exchange obliges the consignee to pay the demurrage. If this seems a hardship, it is a hardsip for which the coal company is alone responsible and it cannot be relieved except by denying a legal right under the tariff of the railway company, which is entirely without fault in this connection.

The views herein indicated accord with the views of the learned judge of the trial court, for, upon these admitted facts, the jury were properly instructed to find for the plaintiff. Instead of doing so, either because they failed to understand the instructions, or because they were contumacious, they found a general verdict for the defendant. This verdict the trial court set aside and entered judgment for the railway company. It could not properly do otherwise, and this court cannot properly do otherwise than affirm this judgment.

*Affirmed.*