# Wytheville.

## SMOKELESS FUEL COMPANY v. THE CHESAPEAKE AND OHIO RAILWAY COMPANY.

### June 16, 1927.

### Absent, Burks, J.

Rehearing denied, with modification, January 11, 1928.

1. DEMURRAGE—*Coal Exchange—"Average Demurrage Agreement"—"Dump in Order"—Case at Bar.*—In the instant case, an action by a carrier to recover demurrage, both plaintiff and defendant were members of a coal exchange. Members of the coal exchange had to sign an agreement to abide by the rules and regulations of the exchange. The rules of the exchange provided for an average demurrage agreement. The rules and regulations of the exchange, however, were not made a part of the carrier's tariff. All the coal was shipped to the exchange as consignee. The tariff under which the demurrage was to be calculated contained no substitution clause, and defendant contended that, in the absence of a tariff provision permitting substitution, the cars must be dumped in the order of their arrival in the pool, in compliance with the common-law duty of the carrier, and if the carrier delivered any cars otherwise than in the order of their arrival, no demurrage could be allowed on such cars. Plaintiff contended that under C. & O. Tariff I. C. C. 7777, Rule 3 (b) and Rule 4, it was permissible to dump cars out of order, and to calculate demurrage charges under the average agreement rule; that is, on a basis which took into account actual detention, and resulted in a demurrage total equal to that which would have resulted if the cars had been physically dumped in order.

   *Held:* That plaintiff was right in its contention that the demurrage might be calculated under the "average demurrage rule."

2. DEMURRAGE—*Coal Exchange—Apportionment of Demurrage Among Members—Case at Bar.*—Under C. & O. Tariff I. C. C. 7777, Rule 3 (b) and Rule 4, plaintiff railroad was entitled, as a matter of right, to $2.00 per day per car for detention of its cars during the month in question against a coal exchange, through the fault of its members, and, under the rules and regulations of the exchange and an agreement between the exchange and its members, to have the total amount of the demurrage apportioned among the members according to the default of each.

3.  DEMURRAGE—*Coal Exchange—Average Demurrage Agreement—Dump in Order—Case at Bar.*—In the instant case, an action by a carrier for demurrage charges, both plaintiff and defendant were members of a coal exchange. The chief defense was, not that there was not a detention of the plaintiff's cars, and not that the cause of the detention was not the fault of members of the exchange, and not that the calculation of the demurrage by the average rule increased the aggregate of demurrage over what would have accrued if the cars had been "dumped in order," and not because any detention of cars as a whole resulted in a dollar of cost to the members, but because the plaintiff failed to dump the cars in the order of their arrival, which it is alleged it was bound to do under its tariff.

    *Held:* That this was obviously a technical defense, and, in addition, was without merit.

4.  DEMURRAGE—*Average Demurrage Rule—When Permissible—Case at Bar.*—In the instant case, an action for demurrage, defendant claimed that under its tariff the carrier was not permitted to calculate demurrage by the average rule. The trial court held that if the tariff under which the plaintiff was proceeding permitted the application of the average rule, then the plaintiff was not at fault, so far as detention of the cars was concerned, and that C. & O. Tariff I. C. C. 7777, the tariff in question, did permit the calculation of demurrage under the average rule.

    *Held:* No error.

5.  DEMURRAGE—*Coal Exchange—Pools—Shippers Lose Identity.*—When shippers become parties to pools they lose their identity from a demurrage standpoint, and so far as the carrier is concerned it need not look beyond the billed consignee, the exchange, in determining the amount of the charges due.

6.  DEMURRAGE—*Rules for Calculating—Dump in Order.*—If an existing tariff does not expressly confine the carrier to the dumping of cars in the exact order of arrival and the method of dumping is not expressly provided for, then the tariff as a whole is open to a construction which may embrace any rule of calculating demurrage which would not increase the aggregate demurrage over the "dump in order" method.

7.  DEMURRAGE—*Rules for Calculating—Average Agreement Rule—C. & O. Tariff I. C. C. 7777, Rule 4.*—Authority for the average agreement principle in calculating demurrage under which the coal exchange in the instant case operated is to be found in Rule 4, C. & O. Tariff I. C. C. 7777, or what is known as the "settlement rule." That rule provides that settlement shall be made on the basis of the detention of all cars *released* during the month. In the instant case settlement was sought strictly under this provision, and the detention was calculated as provided in Rule 3, C. & O. Tariff I. C. C. 7777, unless

it could be said that detention could not be claimed unless the cars were dumped in order. The total detention was exactly as it would have been if the cars had been dumped in order.

8. DEMURRAGE—*Coal Exchange—Average Demurrage Agreement—"Dump in Order"—Case at Bar.*—In the instant case, an action by a carrier to recover demurrage, both plaintiff and defendant were members of a coal exchange. Members of the coal exchange had to sign an agreement to abide by the rules and regulations of the exchange. The rules provided that the exchange should sign the average demurrage agreement with the carriers. No agreement was actually signed, but demurrage was assessed under the average plan. While the average agreement was not actually executed, the interested parties gave effect to it by otherwise, voluntarily, complying with its provisions.

*Held:* That the failure of the exchange to sign the average agreement constituted no reason for finding the demurrage as actually assessed unreasonable and unlawful.

9. APPEAL AND ERROR—*Law of the Case—Demurrage Charges—"Dump in Order"—Case at Bar.*—In the instant case, an action for demurrage by a carrier, the defendant claimed that the Supreme Court of Appeals on a previous appeal (*Smokeless Fuel Co.* v. *Chesapeake and Ohio Ry. Co.*, 142 Va. 355, 128 S. E. 624) decided that the plaintiff was bound by the common-law rule to dump cars in the order of arrival, because this appears in the opinion: "Clause 1 of Rule 3 (b) plainly refers to the common-law duty to dump in order."

*Held:* That if the Supreme Court of Appeals had intended by this expression to hold that plaintiff could not recover demurrage under its tariff, C. & O. Tariff I. C. C. 7777, except on cars dumped in order of arrival, the case would not have been reversed and remanded for a new trial, as there was evidence before that court to enable it to conclude the case either upon the "substitution" or "dump in order" method of determining demurrage for any of the months involved.

10. DEMURRAGE—*Dump in Order—Duty of Railroad to Reduce Demurrage—Fault on the Part of Both Carrier and Consignee.*—It is the duty of the railroad to reduce demurrage charges to what *would have* accrued if the cars had been dumped in order of arrival and to charge the consignee only for detention for which he is responsible—that is, for his fault. Fault on the part of the carrier does not preclude the collection of demurrage from the consignee for detention for which the latter is responsible, but it does preclude the collection of demurrage for detention due to the fault of the carrier. If a failure to dump in order is the cause of detention, then to the extent of such detention the carrier cannot collect demurrage.

11. CARRIERS—*Negligence—Exemption from Liability—Failure to Perform Duty where no Damage Resulted.*—A common carrier cannot exempt

himself from liability for his own negligence by contract, but even in negligence cases no recovery can be had for failure to perform a common-law or statutory duty, unless damage results.

12. Demurrage—*Cars not Dumped in Order—Services not Provided for in Tariff—Case at Bar.*—In the instant case, an action for demurrage, defendant contended that because the cars were not dumped in order of arrival plaintiff could not collect demurrage, as a carrier can only charge for service provided for in its tariffs. While this rule is not questioned, there was a provision in the tariff for charging demurrage for detention of cars by reason of the fault of a consignee, and the decision of the trial court allowing demurrage calculated on the general average basis did not go beyond this.

13. Demurrage—*Fault of Both Carrier and Consignee—Apportionment.*— There may be detention of a single car both on account of the fault of the consignee and of the carrier. In such a case the fault is apportioned according to the detention for which each is responsible and demurrage charged accordingly. The consignee is not exempted from the result of his fault because of the detention due to the fault of the carrier, if the detention for which the consignee is responsible is definitely ascertainable, and is ascertained, as it was in the instant case.

14. Demurrage—*Coal Exchange—Directing Verdict—Case at Bar.*—In the instant case, an action for demurrage, it was assigned as error that the court refused to grant an instruction for defendant, which directed a verdict for the defendant, if the jury should find that the exchange apportioned among its members for the month of February, 1921, a demurrage statement based only on cars on which notices of arrival were sent to the exchange. There were five no-notice cars on the February statement against the exchange, but when they were discovered they were placed in their proper places in the demurrage statement.

*Held:* That defendant was not prejudiced, as no charge was made on these cars.

15. Demurrage—*Reasonableness of Tariff—Provision Against Circumstances Beyond the Control of Consignee—Case at Bar.*—In the instant case, an action for demurrage, it was assigned as error that C. & O. Tariff I. C. C. 7777 was unreasonable and void because it contained no excuse whatever for detention of cars resulting from circumstances beyond the control of the consignee.

*Held:* That there was no merit in this assignment of error.

16. Appeal and Error—*Law of the Case—Former Appeal—Reasonableness of Carrier's Tariff—Case at Bar.*—In the instant case, an action for demurrage, it was assigned as error that C. & O. Tariff I. C. C. 7777 was unreasonable and void because it contained no excuse whatever for detention of cars resulting from circumstances beyond the

control of the consignee. On a former appeal (*Smokeless Fuel Co. v. Chesapeake and Ohio Ry. Co.*, 142 Va. 355, 128 S. E. 624) the application of C. & O. Tariff I. C. C. 8645 was involved. That tariff was identical with 7777, with the exception of a clause not material in this connection. Under the provisions of tariff 8645 final judgment was entered by the Supreme Court of Appeals against defendant for demurrage.

*Held:* That this was apparently an adjudication of the validity of the tariff in this respect.

Error to a judgment of the Circuit Court of the city of Newport News, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Gibbs L. Baker, Claudian B. Northrop,* and *J. Winston· Read,* for the plaintiff in error.

*Henry Taylor, Jr.,* and *Chas. L. Ford,* for the defendant in error.

CHICHESTER, J., delivered the opinion of the court.

This is an action by notice of motion for judgment instituted on May 1, 1922, in the Circuit Court of the city of Newport News by the Chesapeake and Ohio Railway Company, hereafter called plaintiff, against the Smokeless Fuel Company, hereafter called defendant, to recover for car demurrage alleged to be due by defendant to the plaintiff for the months of January, February and September, 1921. The bill rendered defendant was stated in the notice as follows:

| "1921 | Demurrage | War Tax | Total |
|-------|-----------|---------|-------|
| "Jan. | $ 4,667.87 | $140.04 | |
| "Feb. | 5,464.83 | 163.94 | |
| "Sept. | 225.00 | 6.75 | |
| | $10,357.70 | $310.73 | $10,668.43" |

The cause was tried in the circuit court without a jury, with the result that the court entered judgment against the defendant and in favor of the plaintiff for the sum of $8,628.48. A writ of error was duly awarded defendant from this judgment, and after argument before this court the judgment was reversed in part and remanded to the circuit court for a new trial, as will be more specifically stated later, upon the items of the account alleged to be due for the months of January and February, and judgment was entered by this court for the September item. (*Smokeless Fuel Co. v. C. & O. Ry. Co.*, 142 Va. 355, 128 S. E. 624.) The new trial, thus awarded defendant, resulted in a verdict by the jury for the plaintiff for the sum of $7,093.56, with interest from the 25th day of November, 1925, until paid. Judgment was rendered by the circuit court upon the verdict, and this judgment is now before us for review upon the second writ of error awarded in this case.

Before taking up the assignments of error upon the second trial, a brief history of the cause and a summary of what was decided upon the first writ of error seem necessary to a full understanding of the present controversy.

The plaintiff and defendant were members of the Newport News Coal Exchange, Incorporated, a corporation formed in 1917 for facilitating the trans-shipment of tidewater coal from car to vessel. All the

coal of members of the exchange was pooled in the exchange according to size and quality, and while each member of the exchange had credit for whatever coal he shipped in, the exchange was the consignee of all the coal. The coal was never dumped in a heap, but was kept in the cars until ordered dumped into vessels by the member.

Only members could ship through the exchange and to become a member one had to purchase a share of stock and sign an agreement to abide by the rules and regulations of the exchange and to carry out the terms and conditions of membership.

The rules provided for an average demurrage agreement. While all the coal was shipped to the exchange as the consignee and the monthly statements of demurrage were rendered to the exchange, the demurrage charges were apportioned by the exchange among the members according to the detention of cars chargeable to each, and when approved by the members had to be paid by the member to whom it was apportioned and not by the exchange.

The bill sued for in this case went through this process up to the point of approval by the defendant, at which time a controversy arose between the litigants here as to the correctness of the bill. Under the rules and regulations of the exchange each member was required to sign an agreement known as Form C, as follows: "I (or we) hereby agree to pay all freight charges, when waybilled collect, loading charges, and car demurrage charges assigned to me (or us) by authority of the commissioner or deputy commissioner of the Newport News Coal Exchange, Incorporated, on coal shipments going into vessels for my (or our) account at Newport News, Va., under the Newport News Coal Exchange, Incorporated, agreement, whether

shipped from mines, or obtained elsewhere, for my (or our) account, or for the account of any other member of the exchange."

The defendant signed this agreement and it is the basis of this action. The rules and regulations of the exchange, however, were not made a part of the tariff.

The defendant, upon the first trial, while acknowledging some indebtedness for demurrage, resisted payment of the account upon numerous grounds, all of which, upon the first writ of error, this court decided adversely to its contention, except that it appeared from the record that all the demurrage against the defendant had been computed under paragraph 4 of Rule 3 of Tariff I. C. C. 8645, which is as follows:

"Rule 3—Computing Time.

"Paragraph 4.    To reduce switching service and to prevent delay, cars subject to the rules of this tariff may, at the option of the railway company, be delivered otherwise than in the order of their arrival.    In this event the dates on which the substituted cars are delivered will be used in computing the detention of the cars for which they are substituted so that, as far as credit and debit are concerned, the record will be the same as though the cars were being delivered in the order of their arrival."

This rule for computing time is known as the "substitution rule."    It also appeared that this rule did not become a part of the demurrage tariff until March 29, 1921, whereas the account comprised demurrage charges for January, 1921, February, 1921, and September, 1921.    Under these circumstances, this court affirmed the judgment of the trial court as to the September, 1921, demurrage, and remanded the cause to the circuit

court for a new trial to ascertain what, if any, demurrage accrued under the tariff in force during the months of January and February, 1921 (Tariff I. C. C. 7777).

The tariffs, I. C. C. 8645 and I. C. C. 7777, are identical, with the exception of clause 4, above quoted. The parts of Tariff I. C. O. 7777 with which we are concerned are:

"Rule 2—Free Time Allowed.

"An average of five (5) days per car free time will be allowed,   *   *   *   *.

"Rule 3—Computing Time.

"(b) A car shall be considered as released:
"1. At the time vessel registers for the cargo or fuel supply of which the coal or coke dumped into such vessel is a part,   *   *   *."

"Rule 4—Demurrage Charges.

"Settlement shall be made on basis of the detention to all cars released during the month. The date of arrival notice shall be subtracted from the date of release. From the total days detention to all cars thus obtained under Rule 3 deduct five (5) days free time allowance for each car, except on cars containing coke for export, deduct ten (10) days free time allowance for each car; the remainder, if any, will be the number of days to be charged at the rate of $2.00 per car per day. Excess credit days of any month cannot be deducted from excess debit days of another month."

[1] The position of the defendant upon the trial in the circuit court was, and its position here is, that

when a car in each pool is dumped out of order of arrival that the oldest car in that pool should be released on the demurrage books if there is a substitution clause authorizing it in the tariff, and if there is no substitution clause then the cars in that pool must be dumped in the order of their arrival in that pool, in compliance with the common law duty of the carrier. It is then contended that if the carrier, in the absence of a tariff provision permitting substitution, delivered any cars otherwise than in the order of their arrival, no demurrage can be allowed on such cars.

The plaintiff contended in the trial court and contends now that under Rule 3 (b), C. & O. Tariff I. C. C. 7777, quoted above, and Rule 4, also quoted, it was permissible to dump cars out of order, and to calculate demurrage charges under the average agreement rule—that is, on the basis of the cars actually released during the months involved.

Calculated on the basis of defendant's contention, allowing demurrage only on such cars as were actually dumped in order of arrival, the whole demurrage against the exchange for February was (it developed under the evidence that there was none in January) 742 days at $2.00 a day, or $1,484. The defendant's apportionment of this amount, of course, would have been very small.

Under the plaintiff's contention—that is, dumping out of order but calculating demurrage on the average basis (that is, a basis which takes into account *actual* detention, and results in a demurrage total equal to that which would have resulted if the cars had been physically dumped in order)—the total detention of cars for February was 27,974 days, at $2.00 a day, or a total demurrage charge against the exchange of $55,-948.00, of which, because of the defendant's actual detention of cars, $7,093.56 was apportioned to it.

The trial court took a position in accord with the views of the plaintiff, hence the judgment for $7,093.56.

[2] It is perfectly obvious that the plaintiff is entitled, under the terms of its tariff, as a matter of right, to $2.00 per day per car for detention of its cars during the month of February against the exchange, through the fault of its members, and, under the rules and regulations of the exchange and contract C, *supra,* to have the total amount apportioned among the members according to the default of each.

[3] It is also perfectly obvious that the chief defense is, not that there was not a detention of the plaintiff's cars, and not that the cause of the detention was not the fault of members of the exchange, and not that the calculation of the demurrage by the "average rule" increased the aggregate of demurrage over what would have accrued if the cars had been "dumped in order," and not because any detention of cars as a whole resulted in a dollar of cost to the members, but because the plaintiff failed to dump the cars in the order of their arrival, which it is alleged it was bound to do under its tariff. This is, obviously, a technical defense, and, as we believe, in addition to being technical, is without merit.

[4] Most of the assignments of error, of which there are twenty, present this single question. It is raised in bills of exception as to the action of the court in giving instructions at the request of the plaintiff in conflict with this theory, in refusing instructions supporting it (see marginal note, instruction No. 5, refused*); in giving instructions opposed to it; in excluding evidence as to the "dump in order" theory; and in permitting the introduction of evidence in support of the "average rule" method of computing

* "The court instructs the jury that it was the duty of the railroad company to deliver all cars of the defendant in the order of their arrival. And if the jury believe from the evidence that any cars were delivered otherwise than in the order of their arrival, no demurrage can be allowed on such cars."

demurrage; in the ruling as to the introduction of the rules and regulations of the exchange and the contracts between the members of the exchange and the exchange. The trial court proceeded upon the theory that if the tariff under which the plaintiff was proceeding permitted the application of the "average rule" method of calculating demurrage, then the plaintiff was not at fault, so far as detention of the cars is concerned. If the court was right, then its action with reference to all these matters was without error, and they can be disposed of here by a discussion of the single question as to whether the plaintiff, under its tariff, was limited to recovery of demurrage only on such cars as were dumped in the order of arrival.

The conclusion reached by the trial court is in accord with reason and justice. No court, as far as has been brought to our attention, under similar circumstances and a similar tariff, has ever held in accordance with the defendant's contention, and the Interstate Commerce Commission has twice held in support of plaintiff's contention and of the trial court's decision. See *Meeker* v. *C. R. R. Co. of N. J.*, 46 I. C. C. R. 657, and *Tidewater Coal Exchange* v. *B. & O. R. R. Co.*, 96 I. C. C. R. 612. Defendants concede that these decisions are against them, but they assert they are erroneous. The conclusions arrived at, we think, are sound.

We come now to a consideration of the pertinent parts of the tariff (quoted above), under which the demurrage in this case is charged, and as applied to the facts of this case. So far as the facts are concerned, it is important to remember that the exchange was the consignee of all the coal that passed through the exchange, and into each pool thereof; so that there is no distinction as to what could have been done under the tariff in this case and a case where the consignee happened to be an individual.

[5] As was said by the Interstate Commerce Commission in *Wholesale Coal Trade Asso.* v. *Director General,* 58 I. C. C. R. at page 26: "When shippers became parties to the pools they lost their identity from a demurrage standpoint, and so far as the defendants are concerned they need not look beyond the billed consignee, the exchange, in determining the amount of the charges due."

The case is analogous to one (to bring it down to a simple comprehensive basis) where R., a railroad company, delivers to C., a consignee, two cars of coal, to be dumped by the railroad company on the order of C. Car "A" arrives on the first of the month, car "B" arrives on the 10th. No order for dumping either car is given until the 15th. In the meantime R. and C. agree that, as only one car is to be dumped at a time, if more convenient to R., R. may dump car "B" upon the first order and car "A" upon the second, and that the cars may be released as actually dumped, with debits and credits according to the tariff. On the 15th an order to dump one car is given, and R. dumps car "B." On the 20th an order is given to dump car "A." Both orders are complied with. The result would be, car "B," having arrived on the 10th and being dumped on the 15th, when credited five days free time, would be chargeable with no demurrage. Car "A," having arrived on the 1st and being dumped on the 20th, would be chargeable, after a credit of five days free time, with 15 days demurrage, which at $2.00 per day would be $30.00.

[6, 7] On the other hand, if the cars had been dumped in order, Car "A," arriving on the 1st day and being dumped on the 15th, would have been charged with ten days demurrage—$20.00. While car "B," arriving on the 10th and being dumped on the 20th, would have

been chargeable with five days demurrage, or $10.00, making the total account $30.00, which is the exact amount of that arrived at under the "average agreement" plan. C. was in no wise affected, so far as the amount of demurrage is concerned, by the dumping out of order of arrival. The railroad company, as it was bound to do, charged $2.00 per day per car for every day of detention, and it collected no more and no less. The cars were put back into service in exactly the same time as if they had been dumped in order. In other words, every requirement of a demurrage tariff was met, the railroad received compensation for storage in its cars at the legal rate, the consignee was penalized for his detention, and the public interest was protected in the same manner and to exactly the same extent as if the dumping had been in order. The only real difference is in the method of calculating the demurrage. When R. undertakes to collect, however, C. says: "No, I am not hurt, it is true, the public was protected, and I did agree that you should dump the cars out of order and collect demurrage on the average plan, but under your tariff you forfeit all demurrage unless you dump in order of arrival. You failed to perform your common law duty, and although neither I nor any other interest was hurt by it, this failure technically shifts the fault for detention to your shoulders and you can collect no demurrage even if the actual detention was my fault. You cannot collect for any service you perform, unless you perform it in exact accordance with your tariff, and in order for you to dump cars out of order and then collect demurrage, your tariff must specifically permit you to do so." The bare statement of such a proposition is enough to condemn it from the standpoint of right and justice, and we do not think the provisions of tariff 7777 are

susceptible of so narrow a construction.    There is certainly no express provision in the tariff which required a carrier to dump cars in the order of arrival.    It may be conceded that there is a common law duty to dump cars in the order of arrival.    The courts generally seem to concede that there exists some such duty on the part of carriers, but it is discussed for the most part as it applies between two consignees under the "first come first serve" principle.    It exists independently of, and outside of, demurrage tariffs.    Demurrage is a creature of the tariff, and if the "dump in order" duty is not made expressly a part of the tariff, it has application in the tariff only because it is the duty of a carrier to minimize demurrage.    If the existing tariff does not expressly confine the carrier to the dumping of cars in exact order of arrival, as is the case here, and the method of dumping is not expressly provided for, then the tariff as a whole is open to a construction which may embrace any rule of calculating demurrage which would not increase the aggregate demurrage over the "dump in order" method.    We agree with the Interstate Commerce Commission in the *Meeker Case* and in the *Tidewater Coal Exchange Case*, that authority for the average agreement principle under which the exchange operated is found in Rule 4, or what is known as the "settlement rule."    That rule provides that settlement shall be made on the basis of the detention of all cars *released* during the month.    Settlement in the instant case is sought strictly under this provision, and the detention is calculated as provided in Rule 3, unless it can be said that detention cannot be claimed unless cars were dumped in order.    The total detention is exactly as it would have been if the cars had been dumped in order.    Thus, an average of five days free time on each car has been allowed, excluding Sundays

and holidays, credit or debit days have been computed by subtracting the date of arrival notice from the date of vessel registry. At the end of the month, if the credits earned by releasing cars in less than the five days allowed have been equal to or exceeded the debits, there was no demurrage. If the debits have exceeded the credits, the excess number at $2.00 per car per day was the demurrage statement against the exchange for the month, and this was apportioned among the members according to the detention caused by each.

In the *Tidewater Coal Exchange Case, supra,* construing a tariff with provisions exactly similar to the tariff here involved, and without any provision expressly permitting substitution, complainants contended: "That the charges assessed were · * * * (2) unreasonable and illegal for the reason that they were not assessed as if the cars had been unloaded in the order of arrival." But the Commission declined to follow this contention, and held as follows: "With regard to complainant's contention that the demurrage charged was unreasonable and illegal because it was not assessed as if the cars had been unloaded in the order of their arrival, this in effect asks us to substitute the arrival date of cars which had remained longest under load for the arrival date of cars unloaded, but which had arrived later. It was the practice of the exchange, when a vessel was to be loaded, to order tonnage dumped from a designated pool. The exchange did not order cars dumped by initial and number. Witness for complainants stated that to give car numbers on dumping orders would have delayed operations too much. As a result of this practice, cars in a given pool might or might not be dumped in the order of their arrival. Complainants claim that the exchange was entitled to

have all cars dumped in the exact order of their arrival or to have substitution of detention; that it was unreasonable for the carriers to release and unload cars which had not been detained for the full free time, and at the same time permit cars upon which free time had expired and demurrage charges were daily accruing to remain loaded and unreleased.

"Some pools were relatively inactive. The coal contained therein was not disposed of promptly and in some instances remained in the cars for several months. The dumping of cars in the exact order of their arrival was impracticable and inconsistent with operations under the pooling plan. The carriers were obliged to dump tonnage from the pool specified in the order. Cars on hand in greatest number of days might have been, and in many cases were, in other pools which contained different grades of coal. What complainants really desire is substitution of detention without regard to pools."

Again in the *Meeker Case* it is said: "Substitution of detention has been amply provided in every instance where the average agreement is in effect; indeed the very object of the average rule is to permit the handling of cars without regard to the exact order of arrival; and the rules provide for the application of the maximum free time to each car released."

And on page 621 the Commission said: "The average plan does not contemplate that cars shall be unloaded in the order of their arrival. While no average agreement was signed by the parties, the coal was handled under tariff which gave full effect to the average agreement plan."

[8] The *Tidewater Coal Exchange Case* is authority, directly at variance with defendant's argument, that: "In the case at bar there is no average and there is no

agreement." In that case, as in the instant, the rules and regulations of the Tidewater Coal Exchange provided that the exchange would sign the average demurrage agreement with the carriers; but in that case, as in this, no agreement was actually signed.

But the Commission said, at page 616: "No such average agreements were signed, although demurrage was assessed under the tariff which provided for computation thereof on the average plan. While the average agreement was not actually executed, the interested parties gave effect to it by otherwise, voluntarily, complying with its provisions."

And at page 619 of the opinion, this is said: "We do not think that the failure of the exchange to sign the average agreement or the failure of the defendants to give the exchange's members the option of having demurrage assessed on the straight plan constitutes any reason for finding the demurrage as actually assessed unreasonable and unlawful."

Judge Burks, in the *Smokeless Fuel Case, supra,* in speaking of Rule 4 of tariff 7777, says: "Rule 4 of tariff 7777, as well as of 8645, fixes the rate of demurrage at $2.00 per day and seemingly contemplates some sort of average agreement." The learned judge had the *Meeker* and the *Tidewater Coal Exchange* cases before him when he wrote this significant sentence, and he was familiar with all that was said in those decisions as to the application of a tariff exactly similar to tariff 7777 to an average demurrage agreement. Immediately following this expression, the cause was remanded to the trial court to ascertain what demurrage, if any, accrued for January and February under tariff 7777. It had just previously been held, in effect, that the substitution rule of calculating demurrage was not applicable because it was embodied in the tariff after February.

[9] But defendant says this court decided that plaintiff was bound by the common-law rule to dump cars in the order of arrival, because this appears in the opinion: "Clause 1 of Rule 3 (b) plainly refers to the common-law duty to dump in order." If this court had intended by this expression to hold that plaintiff could not recover demurrage under its tariff 7777, except on cars dumped in order of arrival, the case would not have been reversed and remanded for a new trial to ascertain what demurrage, if any, was due under this tariff for January and February, because the trial court, upon the first trial, and this court, upon the first writ of error, heard the cause upon these very issues, and there was evidence before this court to enable it to conclude the case here upon either the "substitution" or "dump in order" method of determining demurrage for any and all months involved. The "average rule," as possibly permissible under the tariff, had not been considered by either court, and it was under these circumstances that the cause was remanded.

The cases relied on by defendant as supporting its position inferentially, fall far short of doing so, we think. We cannot prolong this opinion by a discussion of any number of these cases. It will have to suffice to discuss one or two of those chiefly relied on.

*Granger* v. *Davis* (C. C. A.), 2 Fed. (2d) 695, it is confidently asserted, supports the general proposition that it is illegal to assess demurrage on cars not dumped in order of their arrival. The tariff there considered and the facts are so different from the tariff here being considered and the facts of this case, that it cannot be said to be in the least persuasive. In the *Granger Case*, the defense was that cars assigned to some members of the "Grain and Hay Exchange" were delivered earlier than prior arrivals consigned to the defendant,

and the railroad was not entitled to demurrage when it should have placed defendant's cars earlier if the strict order of arrival had been followed. This is strictly a controversy between consignees under the "first come first serve" doctrine, and not a controversy as to the order of dumping cars of a single consignee. The exchange was not the consignee, as in the instant case. The demurrage was assessed originally against the various consignees, and if a consignment for any one consignee was delayed by running the cars of another around it, obviously the detention thus occasioned was the fault of the railroad and not of the consignee. Moreover, the demurrage rule controlling the situation provided: "Section E. Railroad errors which prevent proper tender of delivery." "Under this rule demurrage will be charged on the basis of the amount that would have accrued but for such errors. This also applies in the case of constructively placed cars being 'run around' by actually placing recent arrivals ahead of previous arrivals." The court held that, under the rule quoted, the "running around" of cars so placed by subsequent arrivals was a railroad error preventing proper delivery of the former and requiring demurrage thereon to be charged on the basis that would have accrued but for such error. It will be noted that, even in this case, the court did not disallow *all* demurrage, as defendant contends should be done here, but permitted demurrage on the basis that *would* have accrued but for the error. In the instant case, defendant contends that although no pecuniary advantage resulted to plaintiff and no pecuniary demage or delay in delivery resulted to it, all demurrage should be forfeited on all cars not delivered in the order of arrival. In the *Granger Case* the effect of the decision under the tariff there con,

sidered was, that whatever detention was due to the fault of the consignee was still assessable against him as demurrage.

This doctrine is recognized in *Lehigh Silk Dyeing Co. v. Director General*, 77 I. C. C. 39.   In that case the Commission held that demurrage charges at "Allentown, Pa., on certain interstate shipments of bituminous coal found not unreasonable or otherwise unlawful, except in so far as they exceeded the charges which would have accrued if the shipments had been placed in the order of their arrival."

[10] The cases hold, in effect, that it is the duty of the railroad to reduce demurrage charges to what *would have* accrued if the cars had been dumped in order of arrival and to charge the consignee only for detention for which he is responsible—that is, for his fault.   Fault on the part of the carrier does not preclude the collection of demurrage from the consignee for detention for which the latter is responsible, but it does preclude the collection of demurrage for detention due to the fault of the carrier.   If a failure to dump in order is the cause of detention, then to the extent of such detention the carrier cannot collect demurrage. This is as far as any of the cases have held the so called common-law rule to apply to or affect demurrage.

[11] In the instant case, exactly the same length of time of detention accrued on all the cars of the consignee, and all because of his fault, as would have accrued if they had been dumped in order.   The aggregate of demurrage was the same.   The contention of the defendant here is that, in spite of the fact that no damage accrued to the consignee by reason of a failure to perform a common-law duty, and in spite of its contract waiving the performance of that duty, it can escape the result of detention for which it was at

fault, except on such cars as were actually dumped in order. It is true, as contended, that a common carrier cannot exempt himself from liability for his own negligence by contract, but even in negligence cases no recovery can be had for failure to perform a common-law or statutory duty, unless damage results.

[12,13] Neither is the issue met by the assertion on behalf of the defendant that because the cars were not dumped in order of arrival the plaintiff cannot collect, because a carrier can only charge for service provided for in its tariffs. This rule is not questioned, but there is provision for charging demurrage for detention of cars by reason of the fault of a consignee, and the decision of the trial court in this case did not go beyond this. The position of the defendant overlooks the fact that there may be detention of a single car both on account of the fault of the consignee and of the carrier. In such a case the fault is apportioned according to the detention for which each is responsible and demurrage charged accordingly. The consignee is not exempted from the result of his fault because of the detention due to the fault of the carrier, if the detention for which the consignee is responsible is definitely ascertainable, and is ascertained, as it is in the instant case.

Upon the whole, we think there is no error in the method by which the trial court ascertained the demurrage alleged to be due for the months of January and February, 1921, under C. & O. Tariff, I. C. C. 7777.

[14] It is assigned as error that the court refused to grant defendant's instruction number 2, which directed a verdict for the defendant, if the jury should find that the exchange apportioned among its members for the month of February, 1921, a demurrage statement based only on cars on which notices of arrival were sent to the exchange.

The evidence of the plaintiff was that there were five cars on the February statement against the exchange, on which, from the records, it did not appear that notices of arrival had been sent by the railway company.

It developed in argument, and later in the testimony of the witness Briers, that when these five no notice cars were discovered, they were placed in their proper places in the demurrage statement, and were given the maximum of five credits each, and no charge was made for demurrage.

The court held that as the cars received full credit and no charge for demurrage was made, the defendant was not prejudiced, and no proof as to "no notice" cars for months other than January and February, 1921, was material. There was manifestly no error in this ruling.

[15,16] Another assignment of error is that the tariff 7777 is unreasonable and void on its face because it contains no excuse whatever for detention of cars resulting from circumstances beyond the control of the consignee. It is contended that the slump in business following the close of the World War was the cause of the congestion of coal in the exchange, and that the detention of cars on this account was beyond the control of the consignee, and as the tariff 7777 did not provide for such an emergency, it was unreasonable and void on its face.

The construction and application of Tariff I. C. C. 8645 was involved in this cause in the first trial before the circuit court and before this court upon the first writ of error, and while this question was not raised, final judgment was entered in this court against the defendant for $251.09, under the provisions of Tariff I. C. C. 8645. That tariff is identical with 7777, with

the exception of the substitution clause, which is not material in this connection, as neither makes any provision for circumstances causing detention beyond the control of the consignee. This is apparently an adjudication of the validity of the tariff, but even if it is not, there is no merit in the contention.

The cases relied on to support this position are *Houston and Texas Ry. Co.* v. *Mayes*, 201 U. S. 321, 26 S. Ct. 491, 50 L. Ed. 772, and *Southern Ry. Co.* v. *Commonwealth*, 107 Va. 777, 60 S. E. 70, 17 L. R. A. (N. S.) 364. The only question decided in the *Mayes Case* was the question of the constitutionality of certain articles of the Revised Statute of Texas, "the material requirement of which is that when the shipper of freight shall make a requisition in writing for a number of cars to be furnished at any point indicated within a certain number of days from the receipt of the application, and shall deposit one-fourth of the freight with the agent of the company, the company failing to furnish them shall forfeit $25.00 per day each car failed to be furnished, the only proviso being that the law 'shall not apply in cases of strikes or other public calamity.' " And as the court, in the second paragraph of its opinion, said: "The question is whether the statute, applied as it is by the Texas court to interstate shipments, is an infringement upon the power of Congress to regulate interstate commerce."

The right of a State to impose such a rigid statute upon the carriers of its own State was not in question. But for the legislature of the State of Texas to attempt to extend its police power over the railroads of the nation was held unconstitutional, for that power lay only in Congress. And that is all the court decided in the *Mayes Case*.

There is nothing in the opinion that suggests that the

statute is "void on its face" because it is "rigid and inexorable." On the other hand, the court says, as quoted above: "The legislature may annex such conditions as they please with regard to intrastate transportation." It is only because this statute "transcends the police power of the State, and amounts to a burden upon interstate commerce" that it is invalid.

There is no real analogy between the *Mayes Case* and the instant case. In the former there was an "absolute requirement" placed upon a public service corporation designed to favor a certain class of shippers. Here, a tariff is designed to assist the carrier in its service to the whole public by requiring the prompt release of equipment by a certain class of shippers. The contrast is apparent. If a shipper can rush his coal to tidewater in unwarranted quantities, gambling on a favorable market which did not turn in his favor, is he to be allowed the use of the railroad equipment as a warehouse where he can store his commodity until his market does turn? And is the carrier to receive no compensation whatever for such use of its cars? The answers to the questions are obvious.

The *Southern Railway Case* was of the same character as the *Mayes Case*, and equally inapplicable here.

In the *Tidewater Coal Exchange Case, supra*, this is said: "During 1920 coal was moving freely and the credits, in most instances, exceeded the debits, so very little demurrage accrued. Not until 1921 was coal detained in cars for long periods. This condition was the direct result of the general business depression which was accompanied by cancellation of contracts and the slackening in the demand for coal. The shippers found themselves with unsaleable coal, which, in some instances, they held for several months.

Adverse business conditions do not justify the cancellation of accrued demurrage.''

All other contentions of any moment advanced in this case were disposed of in the opinion upon the first writ of error, and we adhere to the conclusions there reached.

See also *Eastern Coal & Export Corp.* v. *N. & W. Ry. Co.*, 148 Va. 140, 138 S. E. 471, decided at this term, and cases there cited.

We are of opinion to affirm the judgment of the trial court.

*Affirmed.*